**PARTS AND ELECTRIC MOTORS, INC., an Illinois Corporation, Plaintiff-Appellant,**

v.

**STERLING ELECTRIC, INC., a Delaware Corporation, Defendant-Appellee.**

No. 86–1715.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1986.

Decided Nov. 4, 1987.

John H. Ward, Antonow & Fink, Chicago, Ill., for plaintiff-appellant.

Stephen C. Neal, Kirkland & Ellis, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge, CUDAHY and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

This is an antitrust case brought by Parts and Electric Motors, Inc. ("P & E") against Sterling Electric, Inc. ("Sterling"). P & E is a terminated distributor of Sterling brand electric motors and parts. P & E charges that Sterling violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14, by tying sales of its electric motors (the tied product) to sales of its replacement parts (the tying product). The jury delivered a verdict for P & E on its tying claim. The verdict was set aside in a post-trial order entering judgment n.o.v. and granting a new trial contingent on reversal of the judgment n.o.v. We reverse the judgment n.o.v. and remand the new trial order.

## I.

Sterling, which is a wholly-owned subsidiary of A.O. Smith Corp., manufactures various types of electric motors (also called "finished products") as well as replacement parts for them. Sterling concedes that its parts are unique and that it has 100% dom-

inance in the market for Sterling replacement parts, which are usable only on Sterling finished products. No one else makes parts usable on Sterling finished products. From 1980 to 1984, Sterling sales ranged between $9 million and $12 million annually. Sterling accounts for less than 1% of the market in which its finished products are sold.

P & E has been a Sterling distributor for a number of years but has always carried and continues to carry a number of other brands of electric motors and/or parts. In 1981 and 1982 P & E was the largest national distributor of Sterling parts. In terms of total purchases of Sterling electric motors P & E was third nationally in 1981 and seventeenth of seventy-seven in 1982, a year shortened by Sterling's termination of P & E's distributorship. P & E purchased $90,778 of Sterling electric motors in 1981 and $43,418 in 1982. Its corresponding purchases of parts were larger: $160,593 and $293,262, respectively.

When Sterling was acquired by A.O. Smith, there were over four hundred nonexclusive wholesale distributors of its products. Under its new management, Sterling instituted new distribution programs. Sterling contracted with ten "stocking" parts distributors, including P & E, and a number of "referral" parts distributors. All of Sterling's distributors were non-exclusive. Stocking distributors were able to purchase at lower prices than referral distributors. In turn, Sterling required that each of its stocking parts distributors buy from it and aggressively promote minimum quantities of Sterling electric motors. Under its contractual arrangements with stocking distributors Sterling had the right to terminate the distributors for failure to take the agreed minimum quantities of finished products. Sterling thus conditioned its stocking distributors' rights to purchase Sterling parts upon their purchase of Sterling motors.

In June and July of 1982, Sterling warned that if P & E did not purchase more Sterling finished products, P & E would risk termination of its relationship with Sterling, including the right to continue to buy parts. In response to these admonitions, P & E began steering customers toward Sterling electric motors even though P & E would have recommended other brands if its access to Sterling parts were not in jeopardy. P & E increased its purchases of Sterling motors in June and August 1982; nevertheless, on October 1, 1982, Sterling terminated P & E as a distributor of its electric motors and replacement parts because it regarded P & E's level of Sterling electric motor purchases as insufficient.

P & E then brought this lawsuit. It charges that Sterling's linking of mandatory finished product purchases, the tied product, to continued availability of Sterling parts, the tying product, constituted an illegal tying arrangement. At the jury trial P & E presented evidence with respect to the elements of a *per se* tying case as well as evidence in accord with an alternative rule of reason analysis. Sterling made three motions for directed verdict: one at the end of P & E's case, one at the end of its own case and one at the end of all the evidence. Sterling's first two directed verdict motions were substantially identical to the one it presented at the close of all the evidence, which stated in pertinent part:

D.... Plaintiff has introduced no evidence to show that there was any effect in the tied market. There is no evidence in the record that plaintiff purchased any motors it did not desire to purchase or did not purchase any motors which it wished to have purchased.

E.... In this case, Defendants' activity in restructuring its distribution network was pro-competitive and caused no antitrust injury.

F.... The evidence produced by Plaintiff shows only a manufacturer with a miniscule market share seeking to improve the competitive position of its product in the market place which is economically beneficial to customers.

Defendant's Motion for Directed Verdict At the Conclusion of All the Evidence, R. 78 at 3.

As further discussion will disclose, none of Sterling's motions appears to have asserted that P & E was required to prove the likelihood or danger of Sterling's obtaining market power in the market for the tied product (Sterling electric motors or finished products) as an element of the tying violation.

At the instruction conference, the district court adopted an Instruction 28a which stated in part:

Market power with respect to the tied product, which is electric motors, is not relevant.

Tr. at 955. The remainder of the instruction described the criteria the jury should apply to determine the existence of market

power in the tying product market. Sterling's only objection to Instruction 28a was as follows:

> Defendant objects to Court's 28a in that it's an improper definition of market power since it contains no consideration of profit.

Tr. at 925.

The district court relied on this objection as preserving Sterling's point that a threat of market power in the tied product was an essential ingredient of a tying violation. The district court asserted that the reference to "profit" meant power over price and that this in turn was a reference to market power in the tied product (electric motors).

Sterling's objection to the district court's Instruction 28a came after its own instruction corresponding to 28a, Sterling's proffered Instruction 42a, was rejected by the district court. That instruction stated in pertinent part as follows:

> In order to establish the existence of ... an illegal tying agreement, the burden is upon the Plaintiff to prove each of the following elements by a preponderance of the evidence:
>
> ....
> The Second element that the Plaintiff must prove is that the "tying" product has sufficient economic power or significant market leverage in the market for replacement parts for electric motors to appreciably restrain or foreclose free competition in the market for the "tied" product.
>
> ....
> The Third element that the Plaintiff must prove in support of its anti-trust claim is that the alleged tying arrangement involved a "not insubstantial amount of commerce." In deciding this question you must look to the total dollar volume of sales in interstate commerce by the Defendant to the Plaintiff of the products, if any, which you find to have been tied to the alleged "tying" product. For your guidance in this respect, the Supreme Court of the United States has found that annual sales of almost $200,000 are not insubstantial.

Sterling's Proposed Jury Instruction 42(a), R. 146 at 2–4.

In addition, the court gave an instruction 32a, which permitted a verdict on the "rule of reason" without proof of market power in any market, to which Sterling offered no objection.[1]

Further, Sterling tendered, and the Court gave, six special interrogatories. These required the jury to determine whether or not P & E had proven each of five contested elements of a *per se* case. In addition, Special Interrogatory No. 6 inquired of the jury whether Sterling's conduct constituted an unreasonable restraint of trade. The jury answered each of the six special interrogatories in favor of P & E and found Sterling liable. It subsequently determined damages to be $1,231,992.00, which amount was trebled to $3,695,976.00.

Sterling filed a motion in the alternative for judgment notwithstanding the verdict or for a new trial. In its post-trial motion, Sterling contended, among other things, that "[e]ven if the Sterling distribution program were a tying arrangement, plaintiff has failed to demonstrate the requisite anticompetitive impact on the relevant market." Sterling Motion for N.O.V. or New Trial, R. 107 at 3.

The district court granted Sterling's motion for judgment n.o.v. and ordered a new trial conditionally upon reversal or vacatur of the judgment n.o.v. The district court held that P & E was required, but had failed, to prove a substantial danger that "[Sterling] will acquire market power in the tied product [electric motor] market." In this regard, the district court relied upon *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 674 (7th Cir.1985) (quoting *Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Dev. Co.,* 758 F.2d 203, 210 (7th Cir.1985)), *cert. denied,* 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986). The *Will* opinion was issued on October 28, 1985—more than a month after the verdict was returned and the judgment entered in this case and after the motion for judgment n.o.v. or for a new trial was filed.

---

1. Instruction 32a read in pertinent part as follows:

    If you find that plaintiff has failed to prove either of the following elements, the second element of market power or the fourth element of forcing, but has proven the other elements of separate products, linking of sales, and some injury to plaintiff's business, you must then evaluate the reasonableness of defendant's conduct.

    Tr. at 957–58.

P & E appeals from the grant of the motion for judgment n.o.v. and from the conditional grant of a new trial.

## II.

There are essentially two issues before us in this appeal. The first is whether the district court was correct in its construction of *Will* and *Carl Sandburg Village Condo. Ass'n,* cases which it relied upon for its conclusion that liability under a tying arrangement is predicated in part upon a showing that there is a substantial danger that the tying seller will acquire market power in the tied product market. The second issue is whether the point relating to market power in the tied product market was properly raised and preserved by Sterling in its motions for a directed verdict or in the position it took with respect to jury instructions. If the point was not properly raised and preserved, it is not necessary for us to determine whether *Will* and *Carl Sandburg Village Condo. Ass'n* were properly construed by the district court. As a final matter, we must consider whether alternative grounds support the district court's post-trial order.

■ To preserve the issue of market power in the new motor market for judgment n.o.v. purposes, Sterling would have had to identify the point distinctly and specifically in a motion for directed verdict. In *Johnson v. University of Wisconsin-Milwaukee,* 783 F.2d 59 (7th Cir.1986), we stated:

> Although we have on occasion excused the lack of a formal motion for a directed verdict at the close of all the evidence [as required by Fed.R.Civ.P. 50(a)] where the moving party did move for a directed verdict earlier in the trial and the opposite party was not prejudiced by the moving party's failure to renew the motion, plaintiffs' failure to make a motion for directed verdict at any point in the trial cannot be excused.

*Id.* at 61; *see also Benson v. Allphin,* 786 F.2d 268, 272–75 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986) (failure to renew motion for directed verdict at the conclusion of the evidence excused where neither Seventh Amendment problems nor prejudice to opposing

litigant would result). Moreover, Rule 50(a) of the Federal Rules of Civil Procedure required that "[a] motion for directed verdict ... state the *specific* grounds therefor." (Emphasis supplied.) A party that fails to state its objection to jury instructions specifically cannot challenge the jury's verdict on that issue. *Kinzenbaw v. Deere & Co.,* 741 F.2d 383, 387–88, (Fed. Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985). It seems clear to us that the district court erred in holding that the point had been properly raised and preserved in this case. Sterling argues that paragraphs "D," "E," and "F" (quoted *supra*) of its Motion for Directed Verdict at the Close of All the Evidence raised P & E's failure to prove that Sterling exercised power over price in the new motor market. We cannot agree. These three paragraphs do not seem to us to mention the issue of market power in the tied product let alone preserve it. The phrase "effect in the tied market" ("D") suggests an impact on the volume of business and does not raise an issue of market power. Similarly, mere mention of the terms "pro-competitive" ("E") and "miniscule market share" ("F") is not sufficiently specific to raise an issue of market power in the tied product market. The requirement that the directed verdict motion raise each contested issue in specific terms before the case is submitted to a jury affords the nonmoving party an opportunity to repair the deficiencies in its case. *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1388–89 (7th Cir.1984); *Bonjorno v. Kaiser Aluminum & Chem. Corp.,* 752 F.2d 802, 814 (3d Cir. 1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986).[2]

■ Sterling's request for jury instructions also failed to preserve its position for judgment n.o.v. purposes. Even if this court were prepared to equate objections to jury instructions with motions for directed verdict in this context, despite the contrary requirements of Rule 50(b), we do not believe that Sterling presented its tied market power argument in its objections to the jury instructions. Sterling contends that it was prejudiced by Instruction 28a, "which contained the confusing language regarding the relevancy of market power in the ·

---

**2.** Even Sterling's motion for judgment n.o.v. or a new trial did not specifically state that P & E was required to prove the likelihood or danger of Sterling's obtaining market power in the market for electric motors as an element of the tying offense. Sterling points to the statement in its motion that "plaintiff has failed to demonstrate the requisite anti-competitive impact on the relevant market." We agree with P & E that "requisite impact" appears to invoke a dollar volume standard and not to implicate market power.

tied product and which actually related only to the jury's determination of market power in the tying product." Appellee's Brief at 16.[3] But at trial Sterling did not object to the statement that "[m]arket power [in the tied product] is not relevant." The only objection that Sterling made to Instruction 28a was as follows:

> Defendant objects to Court's 28a in that it's an improper definition of market power since it contains no consideration of profit.

Tr. at 925. Sterling's argument that "consideration of profit" in some unspecified market or markets· necessarily raised the issue of market power in the tied product market is incorrect. In fact the original instruction proposed by Sterling as an alternative to Instruction 28a (Instruction 42a) did not contain any suggestion that tied product market power was relevant. Instruction 42a merely required that the leverage in the market for the tying product be sufficient to "appreciably restrain" competition in the tied product market. Further, as noted, Sterling did not object to the court's Instruction 32a, which permitted a verdict on the rule of reason without proof of market power in any market. In his closing argument, counsel for Sterling enumerated the elements of the cause of action without suggesting that tied product market power was a part of the case.

Thus, it seems to us that Sterling neither proffered an instruction of its own that would have made the threat of market power in the tied product market an element of a tying case nor objected to the failure of the court's instructions to include such a requirement. Accordingly, we agree with

P & E that even if a substantial threat of market power in the tied product market is an essential element of a tying case, this point was not raised and preserved in the trial court for purposes of the judgment n.o.v.[4] In light of the fact that the *Will* opinion was not issued until after the verdict had been rendered and the post-trial motions made in the case before us, this is perhaps not surprising.

■ Sterling also waived its opportunity to argue for a new trial based on its lack of market power in the new motor market. Motions for a new trial are ordinarily "confined almost entirely to the exercise of discretion on the part of the district court." *Allied Chem. Corp. v. Daiflon,* 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980). This court will overturn the approval or denial of a retrial motion only if it identifies a " 'clear abuse of discretion' " on the part of the district court. *General Foam Fabricators v. Tenneco Chem., Inc.,* 695 F.2d 281 (7th Cir.1982) (quoting *Stinebower v. Scala,* 331 F.2d 366, 367 (7th ·Cir.1964)). Here, however, the district court conditionally granted the new trial based on a legal theory that Sterling had failed to raise at trial. Even if Sterling should be correct in its current view of the tied market power issue, it cannot obtain a new trial based on a legal issue that it failed to raise at trial. "When a party might have obtained the correct charge by specifically calling the attention of the trial court to the error and where part of the charge was correct, he may not, through a general exception, obtain a new trial." *Palmer v. Hoffman,* 318 U.S. 109, 111, 63 S.Ct. 477, 479, 87 L.Ed.2d 645 (1943). The

---

**3.** Sterling disputes P & E's suggestion that Sterling's failure to object to the tied product market power issue meant that Sterling agreed that the issue was irrelevant to the case as a whole. Rather, Sterling argues that, by failing to object, it only agreed that the issue of market power in the tied product was irrelevant to the question whether or not Sterling possessed market power in the *tying* product. Nothing in the record, however, lends clear support to Sterling's position on this point.

**4.** The district court believed, however, that even if Sterling had not preserved its objection to Instruction 28a, the court was still permitted under Fed.R.Civ.P. 50(b) to grant Sterling's motion for judgment n.o.v. Relying on *Dual Mfg. & Eng'g, Inc., v. Burris Indus., Inc.,* 619 F.2d 660 (7th Cir.) (en banc), *cert. denied,* 449 U.S. 1027, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980), the district court found that in reviewing its denial of Sterling's directed verdict motion in connection

with the judgment n.o.v., it was governed by the law properly applicable to the case, rather than what the court had asserted the law to be in its instructions. Once again, we are not required to pass upon the district court's interpretation of the substantive law in order to address this point. The conclusion in *Dual Manufacturing & Engineering* about what law controls a judgment n.o.v. takes as its premise that "[a] proper motion for directed verdict" has been made. 619 F.2d at 663 (quoting *Coca Cola Bottling Co. v. Hubbard,* 203 F.2d 859, 862 (8th Cir.1953)); *see also Johnson v. University of Wisconsin-Milwaukee,* 783 F.2d at 61 (requiring statement of objection in motion for directed verdict). In light of our holding that Sterling's directed verdict motion was inadequate in that it did not raise the tied product market power issue for later determination, Fed.R.Civ.P. 50(b), *Dual Manufacturing & Engineering* is not relevant to this appeal.

federal rules also speak to this point: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. We have already discussed the lack of specificity in Sterling's references to its "miniscule market share," its "effects on the tied market," and the "pro-competitive" effects of its tying requirement, and in its objection to the failure of the jury instruction to encourage "consideration of profit." These statements are too vague to reserve the market power issue for purposes of the new trial motion just as they were insufficiently specific to reserve the same arguments for purposes of the judgment n.o.v.

We have recognized an extremely limited exception to this rule and ordered a new trial on grounds not properly preserved where a "series" of plainly erroneous instructions "seriously affected the fairness of the proceeding." *Iskander v. Village of Forest Park*, 690 F.2d 126, 130 (7th Cir.1982). This exception, however, applies only in "extraordinary" circumstances involving manifest error and compelling equities. *Davis v. Consolidated Rail Corp.*, 788 F.2d 1260, 1267–68 (7th Cir.1986); *Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 548–49 (7th Cir.1982). The district court's failure to instruct the jury that market power in the new motor market was an essential element of the claim against Sterling was not plain error; and we do not believe that it is unfair to Sterling to require it to live with the theory it presented at trial. To the extent that the district court's conditional grant of the new trial relied on the tied market power argument, therefore, it must be reversed.

Accordingly, since Sterling failed to raise or preserve the issue, we need not construe *Will* with respect to the requirement of threatened market power in the tied product. The key statement in *Will*, 776 F.2d at 674, appears to be dictum since the *Will* court had already disposed of the appeal by ruling that the plaintiff had failed to prove market power in the tying market. *Id.* at 671. The authority of the *Will* dictum in this circuit may be substantial nonetheless. We note, however, that both *Will* and *Carl*

Sandburg Village Condo. Ass'n, on which *Will* relies, are controlled by *Jefferson Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). In *Hyde*, Justice Stevens' majority opinion, in which four other Justices concurred, reendorses the application of traditional *per se* principles in tying cases.[5] The majority appears to require only that market power in the tying product be "used to impair competition on the merits in another market," 466 U.S. at 14, 104 S.Ct. at 1559, and that "a substantial volume of commerce [be] foreclosed thereby." *Id.* at 16, 104 S.Ct. at 1560. Justice Stevens quotes with approval from Justice White's dissenting opinion in *Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969):

> The tying seller may be working toward a monopoly position in the tied product and, *even if he is not*, the practice of tying forecloses other sellers of the tied product and makes it more difficult for new firms to enter that market.

466 U.S. at 13 n. 19 104 S.Ct. at 1558–59 n. 19 (quoting *Fortner*, 394 U.S. at 513, 89 S.Ct. at 1263–64 (White, J., dissenting) (emphasis supplied)). Justice Stevens, therefore, in *Hyde* does not articulate as a prerequisite to a tying violation that there be a substantial danger that the tying seller will acquire market power in the tied product market. Nonetheless, Justice Stevens does not expressly address the question and it may not be clear what scope, if any, is left to the lower courts to develop the issue. It must be conceded, however, that the Stevens opinion does not seem to suggest any role for the threat of market power in the tied product market as a factor in the analysis.

On the other hand, Justice O'Connor, in a concurring opinion joined by three other Justices, advocates in *Hyde* that *per se* principles of liability be abandoned and that all tying arrangements be analyzed under the rule of reason. 466 U.S. at 33–35, 104 S.Ct. at 1569–70. She contends that to establish a tying violation "there must be a substantial threat that the tying seller will acquire market power in the tied-product market." 466 U.S. at 38, 104 S.Ct. at 1571–72. Justice O'Connor's position is based upon the proposition that "[t]he existence

---

5. "It is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable 'per se'." 466 U.S. at 9, 104 S.Ct. at 1556. *Cf. Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 702 (7th Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984).

of a tied product normally does not increase the profit that the seller with market power can extract from sales of the *tying* product." 466 U.S. at 36, 104 S.Ct. at 1570–71 (emphasis in original). There is a debate among both judges and scholars concerning the effects of tying arrangements. On the judicial debate, *see* 466 U.S. at 33–35, 104 S.Ct. at 1569–70 (O'Connor, J., concurring). On the scholarly debate, *compare* Bowman, *Tying Arrangements and the Leverage Problem*, 57 Yale L.J. 19, 21 (1957) and Bork, *The Antitrust Paradox*, 372–75 (1978) *with* Kaplow, *Extension of Monopoly Power Through Leverage*, 85 Colum.L.Rev. 515 (1985) and Strasser, *An Antitrust Policy For Tying Arrangements*, 34 Emory L.J. 253 (1985). But notwithstanding this debate, the requirement that there be a threat of market power in the tied product has not been endorsed as a requisite for a tying violation by a Supreme Court majority. In any event, whatever the law may be or ought to become, in this case the question is moot since the issue of threatened market power in the tied product market was waived at trial by Sterling.

### III.

Our finding that Sterling waived its arguments concerning market power in the tied product market leads us to consider other grounds upon which we might affirm the judgment n.o.v. and the conditional grant of a new trial. Although the district court's post-trial order focused exclusively on Sterling's lack of market power in the new motor market [6] we will examine Sterling's alternative argument to determine whether any alternative basis for the post-trial relief exists. *Cf. Miller v. Gateway Transp. Co.*, 616 F.2d 272, 275 (7th Cir. 1980) (summary judgment may be affirmed on grounds supported in record even if not relied upon by lower court). Sterling first urges that its distribution program should not have been subjected to tie-in analysis at all. Rather, Sterling claims that the program was merely an effort to obtain vigorous representation of its full line of products. Vertical restraints were purportedly imposed to enhance Sterling's competitiveness and to eliminate "free rider" problems. This is an argument of considerable potential merit that will be explored below.

Even if its conduct is subjected to a tie-in analysis, Sterling argues: (1) P & E failed to prove the existence of two separate products; (2) there was no proof of market power in the tying product market; (3) there was no proof of any foreclosure of competition in the tied product market; and (4) there was no proof of a threat to acquire market power in the tied product market.

As we have already discussed at length, Sterling has waived its tied product market power argument. The remaining contentions must be considered separately as potential support for the judgment n.o.v. and for the conditional retrial order. As potential support for the judgment n.o.v., Sterling's alternative arguments encounter two problems. First, the standard of review presents Sterling with a difficult obstacle. There must be such a failure of evidence that "reasonable men in a fair and impartial exercise of their judgment" could not have reached the same conclusion as the jury. *Freeman v. Franzen*, 695 F.2d 485, 488 (7th Cir.1982), *cert. denied*, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983); *Konczak v. Tyrrell*, 603 F.2d 13, 15 (7th Cir.1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980). Second, the jury answered special interrogatories which appear to specifically address Sterling's other arguments.

We turn first to the remaining three of Sterling's four arguments that assume a tie-in analysis. Regarding the first, the jury specifically decided that Sterling's parts and electric motors were two separate and distinct products with separate markets. Special Interrogatory No. 1. Regarding the second, the jury specifically found that Sterling "possessed the ability to use dominance over the supply of Sterling replacement parts or [sic] force others to buy ... other products." Special Interrogatory No. 2. "Market power" is described in *Hyde* as the special ability of a seller to force a purchaser to do something he would not do in a competitive market. 466 U.S. at 13–14, 104 S.Ct. at 1558–59. Thus, the jury's verdict on Special Interrogatory No. 2 equals a finding of market power in the tying product. With reference to Sterling's third contention, a combination of the answers to Special Interroga-

---

**6.** The district court's April 14, 1986 post-trial order does not discuss Sterling's alternative arguments. The only language that even remotely suggests consideration of these arguments is a reference to "other things" (apart from the issue

of market power in the new motor market) that should have kept P & E's claim from the jury. No. 83 C 2349, mem. op. at 4 (N.D.Ill. Apr. 14, 1986) [Available on WESTLAW, DCT database].

tories 1–5 amounts to a finding of foreclosure of competition in the tied product market. The jury also found specifically that Sterling's conduct was an unreasonable restraint on trade. Special Interrogatory No. 6.

In reviewing the district court's grant of judgment n.o.v., we must reverse if the record contains evidence that supports the jury's verdict.

> Jury factfinding, unlike judicial factfinding, is not subject to direct attack as "clearly erroneous." In view of the Seventh Amendment's prohibition ... a jury verdict can only be set aside if the "evidence [viewed] in the light most favorable to the plaintiff and ... [the] facts and inferences reasonably drawn from the facts ... lead to but one conclusion—that there is a total failure of evidence to prove the plaintiff's case."

*Independence Tube Corp. v. Copperweld Corp.*, 691 F.2d 310, 319 (7th Cir.1982) (citations omitted), *rev'd on other grounds*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Under this standard, we believe there is ample evidence in the record to support the jury verdicts, which include the answers to the special interrogatories.

■ On the separate products issue, P & E presented evidence of differences in the distribution channels, markup, margins, industry treatment and sources of demand for electric motors and repair parts. *Cf. Hyde*, 466 U.S. at 19–21, 104 S.Ct. at 1561–62 ("[T]he answer to the question whether one or two products are involved turns ... on the character of the demand for the two products." *Id.* at 19, 104 S.Ct. at 1561–62.). Even functionally related products, one of which is useless without the other, have been held to be the subject of illegal tying arrangements. *Id.* Repair parts and finished goods have been expressly held to be separate products capable of being tied. *See Mozart Co. v. Mercedes-Benz of North America*, 593 F.Supp. 1506, 1514–15 (N.D. Cal.1984); *Grappone v. Subaru of New England*, 534 F.Supp. 1282, 1289 (D.N.H. 1982) (passenger cars and replacement parts held to be separate products).

■ Similarly, on the issue of market power in the tying product, Sterling conceded at trial that it has 100% dominance in the market for Sterling parts and that Sterling parts are unique. Tr. at 315–16. When the seller's share of the market is high, or when the seller offers a unique product that competitors are not able to offer, the likelihood is that market power exists. *Hyde*, 466 U.S. at 17, 104 S.Ct. at 1560–61.[7]

■ Additional evidence substantiated Sterling's market power. In addition to testimony from P & E's expert witness directly on point, there was evidence that no alternative sources existed for Sterling parts; that no one but Sterling manufactured parts compatible with Sterling motors; and that there are effective economic barriers to entry into the market for parts compatible with Sterling motors since the demand for Sterling parts will accommodate only one manufacturer. In addition, P & E adduced evidence that showed that there was general acceptance of the tie among Sterling distributors. The existence of several tying arrangements provides significant evidence of a defendant's power to restrain free competition. *Northern Pac. Ry. v. United States*, 356 U.S. 1, 7–8, 78 S.Ct. 514, 519–20, 2 L.Ed.2d 545 (1958).

As to foreclosure of competition in the market for the tied product, the jury's findings were twofold: Sterling's conduct was a *per se* violation of antitrust tying law, and it also was an unreasonable restraint of trade. Of course, in a *per se* case, injury to competition is in principle conclusively presumed and need not be proved. *Hyde*, 446 U.S. at 9–10, 104 S.Ct. at 1556–57. As we have recognized, there are those who suggest that tying arrangements should not be subject to *per se* analysis, but rather should be evaluated always in light of actual competitive consequences. *See, e.g.*, Dam, Fortner Enterprises v. United States Steel: *Neither a Borrower, Nor a Lender Be*, 1969 Sup.Ct. Rev. 1, 19; R. Bork, *The Antitrust Paradox* 375–81; *see also Hyde*, 466 U.S. at 21 n. 34, 104 S.Ct. at 1563 n. 34 ("[I]n a sense the question whether this case involves 'ty-

---

7. The Supreme Court's characterization of "market power," *see Hyde*, 466 U.S. at 13–14, 104 S.Ct. at 1558–59, has been alternatively stated in this circuit as "power over price," or the ability to induce buyers to pay more money by cutting back the supply of goods available for purchase. *Will*, 776 F.2d at 671. The best way to show power over price is to establish directly that the price of the tied package is higher than the price of components sold in competitive markets. *Id.* at 671–72. However, in the absence of direct evidence to this effect, a plaintiff may demonstrate market share or uniqueness as proxies for power over price. *Id.* at 673; *see also Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 611–613, 73 S.Ct. 872, 881–83, 97 L.Ed. 1277 (1953) (on market dominance); *Fortner*, 394 U.S. at 504–05, 89 S.Ct. at 1529–30 (on tying).

ing' is beside the point.... If the competitive consequences of this arrangement are not those to which the *per se* rule is addressed, then it should not be condemned irrespective of its label.").

■ We need not decide whether Sterling's scheme was *per se* illegal, because the jury concluded that Sterling's distribution arrangement unreasonably restrained competition. Viewing this as a rule of reason case only, substantial evidence supports the jury's special verdicts.

Sterling claims that the program it instituted was a permissible vertical distribution arrangement, designed to achieve the legitimate end of enhancing its competitiveness by deterring "free riding." Sterling argued this theory to the jury on several occasions, *e.g.,* Tr. at 885–904, but the jury nevertheless concluded that Sterling's conduct was an unreasonable restraint of trade. Sterling characterized its program as entirely rational and benign:

> All that Sterling insisted was that, in exchange for the substantial discounts it was receiving, P & E bear its share of developing the motor market on which Sterling's replacement parts business is entirely dependent.

Appellee's Brief at 8. However, the jury concluded that Sterling's actions were unreasonable, and this conclusion is supported by record evidence. The trial testimony permits a conclusion that P & E was not a free rider at all—P & E had voluntarily carried Sterling motors for four years before the tie-in was proposed, and P & E placed third nationally among Sterling distributors for its sales of motors in 1981 and was in the top quarter in 1982, a year shortened by P & E's termination. P & E apparently promoted the Sterling line in its mailings to customers and stressed to its sales force to "keep pushing" Sterling products. Such behavior by P & E certainly was rational, inasmuch as its sales of Sterling parts could only be helped if it also sold new Sterling motors to its customers. If Sterling's vertical distribution program is judged only by its competitive consequences, as Sterling argues, there is evidence that Sterling's distributors were forced after the tie-in to increase their purchases of Sterling's motors by more than $250,000, presumably at the expense of Sterling's competitors, and testimony that P & E employees engaged in customer "steering," that is, in diverting customers to Sterling motors over other brands. The

effect of Sterling's tie-in could reasonably be perceived by the jury as giving a competitive edge to Sterling products based not on their merits, but on Sterling's tie. Certainly a jury might have concluded the distribution program was reasonable but that case is not before us.

The cases cited by Sterling to justify its distribution arrangements are not persuasive. *See Pitchford v. Pepi, Inc.,* 531 F.2d 92 (3d Cir.1975), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *David R. McGeorge Car Co. v. Leyland Motor Sales,* 504 F.2d 52 (4th Cir.1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975). Neither case apparently involved a defendant who used market power in the "tying" product to affect a second market. In addition, *Pitchford* involved the tie-in of only a single unit of the tied product, as a sample. In *David R. McGeorge* the distributor was terminated for refusing to carry one product line at all, not for deficient sales of that line.

We believe, in sum, that the contention that the arrangements between P & E and Sterling were a legitimate implementation of Sterling's distribution strategy has some force, but the jury rejected it, and there is adequate evidence to support the jury's verdict against a motion for judgment n.o.v.

We turn now to the question whether Sterling's arguments about the elements of the case might provide alternative grounds for the district court's conditional grant of a new trial. This court, as we have indicated, ordinarily accords great deference to a district court's approval or denial of a new trial motion. Reluctance to second-guess the trial court's decision on a motion for retrial should be especially strong with respect to decisions based on the trial court's assessment of the weight of the evidence. *Compare General Foam,* 695 F.2d at 288 (reversing judgment n.o.v. but upholding determination that jury verdict "was against the clear weight of the evidence") *with Eulo v. Deval Aerodynamics, Inc.,* 430 F.2d 325 (3rd Cir.1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971) (reversing district court's decision to grant new trial for supposed errors in jury instructions). While the record contains too much support for P & E's claims to justify a judgment n.o.v., we are not now in a position to say that P & E's proof was too strong for the district court to have concluded that the manifest weight of the evidence favored Sterling.

In this case, it is true, the district court has not stated that the jury's verdict was contrary to the weight of the evidence when assessed against the instructions that guided the jury's deliberations. Moreover, the record, viewed from our comparatively remote vantage point, reveals no such imbalance. Nevertheless, we are reluctant to ignore the possibility that the district court perceived such an imbalance but declined to discuss it in the belief that Sterling's tied market power argument obviated the need to elaborate on these "other things." We will therefore remand the retrial order for clarification on this point. If the conditional retrial order rested solely on the stated grounds, judgment will be entered for P & E. If, on the other hand, the district court also believed, based on some previously unstated but substantial and defensible grounds, that the manifest weight of the evidence favored Sterling when assessed against the instructions under which the jury deliberated, then the court may proceed with the new trial.

We recognize the economic and philosophic debate in antitrust circles about tying arrangements. *See* P. Areeda, *Antitrust Analysis* 734–808 (3d ed. 1981). The requirement of a substantial threat of market power in the tied product market (a condition unlikely to be met in a great many tie-in situations) reflects a point of view that tying is less injurious to the consumer welfare and more supportive of legitimate economic ends than traditional legal analysis suggests. Here, of course, Sterling waived its right to argue that threatened market power in the tied product market is an essential element of a tying violation. The case went to the jury under instructions to which Sterling made no sufficient objection. The jury decided liability, including six special verdicts in favor of P & E. There was sufficient evidence to support the verdicts in the face of Sterling's motion for judgment n.o.v., although there may possibly not have been sufficient evidence to preclude the district court from finding that the verdict in favor of P & E was against the manifest weight of the evidence. At least, the district court should have the first opportunity to rule on the latter question. For these reasons, the judgment n.o.v. is reversed and the judgment conditionally granting a retrial is vacated and remanded for further proceedings not inconsistent with this opinion.

REVERSED IN PART, VACATED IN PART AND REMANDED.