979 F.2d 546
 61 USLW 2318, 1992-2 Trade Cases P 70,023
 A.O. SMITH CORPORATION and 16752 Corporation, f/k/a Sterling
Electric, Inc., Plaintiffs-Appellants,
v.
LEWIS, OVERBECK & FURMAN, Douglas A. Lindsay, Robert A.
Subkowsky and Robert A. Wolz, Defendants-Appellees.
 No. 91-3763.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 18, 1992.
Decided Nov. 9, 1992.
Rehearing and Rehearing En Banc
Denied Dec. 9, 1992.
 
 Scott W. Hansen (argued), Anne W. Reed, Brian D. Trexell, Reinhart, Boerner, Vandeuren, Norris & Rieselbach, Milwaukee, Wis., James D. Holzhauer, Javier H. Rubinstein, Mayer, Brown & Platt, Chicago, Ill., for plaintiffs-appellants A.O. Smith Corp. and 16752 Corp. fka Sterling Elec., Inc.
 Stephen R. Swofford, George W. Spellmire (argued), Thomas P. McGarry, D. Kendall Griffith, G.J. Bazydlo, Hinshaw & Culbertson, Chicago, Ill., for defendants-appellees Lewis, Overbeck & Furman, Douglas A. Lindsay, Robert A. Subkowsky and Robert A. Wolz.
 Before CUMMINGS, COFFEY, and EASTERBROOK, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 This is the third time that this antitrust claim has come before this Court in one form or another.[1] In its latest incarnation the losing party is suing its lawyers for agreeing to an allegedly faulty jury instruction in the original trial in 1985. In that case, Parts and Electric Motors, Inc. ("P & E") brought a tying claim under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 3 of the Clayton Act (15 U.S.C. § 14) against Sterling Electric, Inc. ("Sterling") after Sterling canceled P & E's contract to distribute Sterling brand electric motors and parts. In the 1985 trial, P & E requested and Sterling's lawyers acceded to a jury instruction that characterized market power in the tied product as irrelevant to a successful tying claim. Sterling now asserts that the $5,844,022.41 judgment against it was due to this allegedly erroneous jury instruction. Sterling, which is defunct, and its parent A.O. Smith Corporation ("A.O. Smith") seek to recoup the nearly $6 million from its former counsel, Lewis, Overbeck & Furman as well as three attorneys in the firm (collectively "Lewis, Overbeck"). The district court dismissed Sterling's action on the premise that market power in the tied product market is not required for a successful tying claim. 777 F.Supp. 1405. We reverse. Without deciding whether antitrust law now demands proof of market power in the tied product, such proof was required in this Circuit in 1985 when the original trial was held.
 
 I.
 
 2
 At the time of the 1985 trial that gives rise to the current dispute between Sterling and its former lawyers, Sterling was a manufacturer of electric motors and parts. P & E was a Sterling distributor, principally of Sterling brand parts. Indeed, P & E was the largest national distributor of Sterling parts in 1981 and 1982. Sterling conceded that its electric parts, which fitted only Sterling brand electric motors, formed a unique market in which the company had 100 percent market dominance. However, Sterling's share of the new electric motors market was only about one-tenth of 1 percent during the relevant period.
 
 
 3
 P & E had carried Sterling products for many years but, like the approximately 400 other Sterling wholesale distributors, it sold other brands of electric motors as well. After A.O. Smith acquired Sterling in 1980, it sought to bolster Sterling's position in the finished product market above its anemic .1 percent share. According to P & E, Sterling tried to improve its position through an illegal tying arrangement. Tying arrangements involve an agreement to sell one product (the tying product) only on the condition that the purchaser buy a second product (the tied product). Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 518-19, 2 L.Ed.2d 545. In this instance, Sterling used its strong position in the parts market (the tying market) to gain leverage in the new motors market (the tied market).
 
 
 4
 Sterling's efforts centered on encouraging certain of its distributors to market more aggressively Sterling's new electric motors. To this end, it created two tiers of distributorship. One set of relationships was with so-called "stocking" parts distributors, including P & E, who would be able to purchase Sterling products at lower prices than would be available to the second tier of distributors. In return, these "stocking" distributors were contractually obligated to buy and promote a minimum number of Sterling electric motors. Sterling reserved the right to cancel contracts with "stocking" distributors who failed to purchase a requisite number of motors.
 
 
 5
 P & E claimed that pressure from the manufacturer forced it to steer customers toward purchases of Sterling motors. Nevertheless, despite increasing sales of Sterling electric motors after warnings from the manufacturer in mid-1982, P & E's distributorship contract for both parts and motors was terminated for selling too few motors. As noted, P & E sued Sterling for violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14, which prohibit certain tying or tie-in arrangements.
 
 
 6
 At trial, the district court adopted a jury instruction that stated in part, "Market power with respect to the tied product, which is electric motors, is not relevant" ("Instruction 28a"). Sterling's counsel and defendant in this action, Lewis, Overbeck, did not dispute P & E's characterization of tied market power as irrelevant. Its only objection to the instruction was as follows:
 
 
 7
 Defendant objects to Court's 28a in that it's an improper definition of market power since it contains no consideration of profit.
 
 
 8
 A Chicago jury returned a $1,231,992 verdict in actual damages against Sterling, which was trebled under Section 4 of the Clayton Act (15 U.S.C. § 15), as well as a $13,690.54 award for breach of contract, and a counterclaim in favor of Sterling for $37,196.94.
 
 
 9
 Judge Holderman granted Sterling's motion for judgment notwithstanding the verdict because P & E had not proved market power in the tied market (new motors), which he determined to be an essential element of a tying claim. Indeed, it is unlikely that P & E could have proved market power in new electric motors given Sterling's .1 percent share of that market. However, Sterling's conversion to the religion of tied market power had come too late. On appeal, this Court reinstated the jury award because Lewis, Overbeck had waived the tied market power issue by failing to object specifically to P & E's jury instruction. Parts and Elec. Motors v. Sterling Elec. Inc., 826 F.2d 712, 716-717 (7th Cir.1987) ("P & E I "). Though Lewis, Overbeck objected to Instruction 28a, it faulted only the definition of market power for containing "no consideration of profit," rather than Instruction 28a's essential depiction of market power in the tied product market as irrelevant. Id. at 717. Lewis, Overbeck offered no competing instruction regarding market power in the tied market and it did not object to the court's failure to include such an instruction. Id. Having waived the tied market power argument, Sterling's basis for j.n.o.v. evaporated. Sterling made a number of other arguments--for example, that P & E had not proved market power in the tying market and that competition had not been foreclosed in the tied product market--but the panel rejected these. The Court remanded the case to Judge Holderman to determine whether the verdict for P & E was against the manifest weight of the evidence.
 
 
 10
 Judge Holderman did not think so. Sterling appealed again with recycled arguments. As Judge Bauer's majority opinion noted, "this case should not be here. In our view, it represents Sterling's second attempt to wriggle out of a legal theory it argued unsuccessfully to the jury." Parts and Elec. Motors, Inc. v. Sterling Elec., 866 F.2d 228, 234 (7th Cir.1988) ("P & E II "). The P & E II majority upheld the "threadbare" antitrust claim because Sterling should be forced to "live with the theory it presented at trial." Id. Judge Posner would have been more lenient on the manufacturer. In dissent, he ridiculed the notion that parts designed exclusively for Sterling motors represented a market unto itself for antitrust purposes. He speculated that Sterling's share of the market for electric parts generally was roughly equivalent to its share of the market for new electric motors, or less than 1 percent. Without market power even in the tying market, Judge Posner found the jury award "irrational. * * * So clear is the verdict's unreasonableness that we can order a new trial even though Judge Holderman, perhaps out of pique at our decision reversing him, refused to do so." Id. at 236 (Posner, J., dissenting).
 
 
 11
 The Supreme Court denied certiorari. 493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100. Having failed in two appeals, Sterling instituted this action against Lewis, Overbeck for legal malpractice and breach of contract. The district court dismissed the breach of contract claim because legal malpractice actions sound in tort law, and he dismissed the tort action for lack of causation after determining that proof of tied market power is not required.II.
 
 
 12
 This Court reviews de novo a district court's dismissal of an action. Rockford Mut. Ins. Co. v. Amerisure Ins. Co., 925 F.2d 193, 195 (7th Cir.1991). Dismissal is appropriate if there are no facts in a well-pleaded complaint which, if accepted as true, would support a plaintiff's claim for recovery. New Burnham Prairie Homes, Inc. v. Burnham, 910 F.2d 1474, 1477 (7th Cir.1990).
 
 
 13
 Dismissal of the tort action was not appropriate here. The opinion below undertakes an exhaustive but unnecessary tour through recent antitrust case law in the Supreme Court and in this Circuit. The district court decision, dwelling as it does on a number of cases decided after the 1985 trial, assumes that the relevant question is whether proof of tied market power is required now, not whether it was required at the time of trial. This view cannot be correct. Both Illinois law governing legal malpractice actions and common sense suggest that an attorney's performance at trial must be evaluated by the state of the jurisprudence at the time of trial. Land v. Auler, 186 Ill.App.3d 382, 384, 134 Ill.Dec. 330, 542 N.E.2d 509 (1989), appeal denied, 127 Ill.2d 618, 136 Ill.Dec. 588, 545 N.E.2d 112 (1989) ("Such a factual determination rests with the state of the law during the period of the disputed legal representation"); O'Brien v. Noble, 106 Ill.App.3d 126, 130, 61 Ill.Dec. 857, 435 N.E.2d 554 (1982) ("an attorney's conduct is to be viewed in the context of events at the time of the alleged malpractice, not in the light of subsequent developments"); Brainerd v. Kates, 68 Ill.App.3d 781, 786, 25 Ill.Dec. 315, 386 N.E.2d 586 (1979) ("in determining whether this defendant was or was not negligent it is necessary to judge his conduct by the factual situation which existed during the months * * * when the notice of appeal was actually filed"). After all, it would be manifestly unfair to expect lawyers in the midst of trial to predict how the circuit courts and the Supreme Court will shape new legal doctrine.
 
 
 14
 The district court relied on certain decisions subsequent to the 1985 trial because they were decided "closely on the heels of the antitrust trial" and these precedents might have been taken into account on appeal. The logic behind this reasoning is elusive. Though it might in some sense be easier to predict the near future than the distant future, it is nevertheless quite unrealistic to judge lawyers in a malpractice action by decisions that have not yet been handed down. In short, the question is whether proof of market power in the tied product market was required in 1985, not whether it is required in 1992.[2]
 
 III.
 
 15
 This Court's decision in Carl Sandburg Village Condominium Ass'n No. 1 v. First Condo Dev. Co., 758 F.2d 203 (1985), rendered just months before the trial between Sterling and P & E, was the Seventh Circuit's last and controlling word on tying law at the time the underlying case was tried. In Sandburg Village, a condominium association alleged that developers illegally tied the purchase of long-term management contracts to the sale of condominium units. The Court's opinion stated directly that market power in the tied product market is an essential element in an antitrust claim of tying:
 
 
 16
 One of the threshold criteria that a plaintiff must satisfy under both the per se and rule of reason analyses in order to show that such an extension of the seller's market power may pose a threat of economic harm and an unlawful restraint of trade is that there is a substantial danger that the tying seller will acquire market power in the tied product market.[3]
 
 
 17
 Id. at 210 (emphasis added).
 
 
 18
 Sandburg Village 's treatment of tied market power is straightforward. The defendants, then, saddled with Instruction 28a's depiction of tied market power as irrelevant, are left with two tactics: one is to claim that the opinion does not say what it says, the second is to write it off as bad law. Yet it is difficult to obscure prose as clear as Sandburg Village 's discussion of tied market power; defendants' efforts are torturous. They argue that the language concerning tied market power was dicta: not law but, in the words of the lower court judge in the instant action, "a statement of the broad policy goals of tying law--for which purpose the citation is wholly unobjectionable--and not as a binding statement of circuit law." A.O. Smith Corp. v. Lewis, Overbeck & Furman, 777 F.Supp. 1405, 1414 (N.D.Ill.1991). This distorts Sandburg Village. There this Court had no reason to add a prima facie element to conventional tying analysis, as defendants claim, unless the element was essential to the holding of the case. We will assume that judges on this Court do not blithely erect hurdles for antitrust plaintiffs to jump over without regard to the case they are deciding. More to the point, our Sandburg Village opinion affirmed the district court's dismissal of the tying claim because plaintiffs failed to offer proof of tied market power. Sandburg Village, 758 F.2d at 210. Thus the Sandburg Village discussion of tied market power is not dicta.
 
 
 19
 A number of courts have interpreted Sandburg Village to mean precisely what it says: Antitrust plaintiffs must prove the substantial danger that defendant will acquire market power in the tied market under both rule-of-reason and per se claims. See, e.g., W.H. Brady Co. v. Lem Products, Inc., 659 F.Supp. 1355, 1372 (N.D.Ill.1987). Indeed, Will v. Comprehensive Accounting Corp., 776 F.2d 665, 674 (7th Cir.1985), certiorari denied, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986), decided after the 1985 trial between Sterling and P & E but before post-trial motions, quoted Sandburg Village approvingly on this point exactly. Moreover, in granting Sterling's motion for j.n.o.v. following the 1985 trial, Judge Holderman found the statements on tied market power in Sandburg Village and Will so clear that he determined the case should not have even gone to the jury, much less with an instruction that tied market power was irrelevant. Defendants might have argued that Sandburg Village required only "substantial danger" of tied market power, as opposed to actual tied market power, but even so Instruction 28a's irrelevancy language was fatally flawed. Defendants cite no cases in support of their contention that Sandburg Village 's discussion of market power in the tied product market was superfluous.
 
 
 20
 In fact, here Lewis, Overbeck did not even bother to mount such an argument in the district court. As the lower court noted in evaluating the parties' arguments:
 
 
 21
 Law Firm's argument seems to concede that Sandburg and Will did establish tied market power--perhaps temporarily, perhaps wrongly--as an element of a per se tying claim in this Circuit at the time of trial. Nowhere in its filings before this Court does Law Firm seriously contend that Sandburg and Will were wrongly applied by Judge Holderman, who was obligated (as this Court would have been) to follow circuit law.
 
 
 22
 A.O. Smith Corp., 777 F.Supp. at 1412. It was only after the court below questioned the clarity of Sandburg Village that defendants jumped on this bandwagon. But Lewis, Overbeck's initial reading of Sandburg Village was correct: the opinion explicitly requires the showing of substantial danger of tied market power.
 
 
 23
 Lewis, Overbeck next argues that the district court was correct in departing from earlier courts' readings of Sandburg Village because any other interpretation would have been like "jump[ing] off a cliff." (Defendants' brief at 27). This goes to defendants' second method for obscuring the obvious meaning of Sandburg Village: to dismiss it as bad law. According to defendants, Sandburg did not control in the 1985 trial because it was at odds with the Supreme Court's decision in Jefferson Parish Hospital Dist. No. 2 v. Hyde, 466 U.S. 2, 104 S.Ct. 1551. The majority opinion in Jefferson Parish reiterated its support for the traditional per se analysis of tying arrangements. "It is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable 'per se,' " wrote Justice Stevens for the five members of the Court's majority. Id. at 9, 104 S.Ct. at 1556. Justice O'Connor's concurrence, which was joined by the three remaining justices, urged the Court to abandon the per se approach to tying cases because the doctrine incurs the costs of the rule-of-reason approach without achieving the per se benefits of economy and clarity. Id. at 34, 104 S.Ct. at 1569-70 (O'Connor, J., concurring). The fundamental disagreement between the majority opinion and Justice O'Connor's concurrence was over the continued usefulness of the per se doctrine in tying cases given the required inquiry into market conditions.
 
 
 24
 Justice O'Connor also, in describing the prima facie tying claim, stated that "there must be a substantial threat that the tying seller will acquire market power in the tied-product market." Id. at 38, 104 S.Ct. at 1572. A seller will not acquire market power in the tied market, Justice O'Connor hypothesized, when the tied market is occupied by many stable sellers or the barriers to entry are low. Id. The Jefferson Parish majority never addressed the tied market power issue directly and Sandburg Village cited the O'Connor concurrence as support for its holding that tied market power was required. Sandburg Village, 758 F.2d at 210.
 
 
 25
 Defendants contend that the failure of the majority in Jefferson Parish to endorse tied market power meant that this option was foreclosed to the courts of appeal. Yet it is a peculiar notion that silence by the Supreme Court means preclusion for the circuit courts. Lewis, Overbeck attempts to gain some sustenance for its argument from our opinion in P & E I. That opinion could be read to question Sandburg Village and Will 's allegiance to the spirit of Jefferson Parish. However, P & E I notes that the Jefferson Parish majority left open the question of tied market power without addressing what discretion was left to the circuit courts. P & E I, 826 F.2d at 718. Ultimately, P & E I begged the tied market power question because Sterling's counsel had waived the issue on appeal.
 
 
 26
 Whatever the failings of Sandburg Village, attorneys in this Circuit are bound by all the decisions of this Court, not just those they deem consonant with Supreme Court doctrine. The correct remedy in such circumstances is to petition for certiorari, or to argue in good faith for a change in the law--but the remedy is not simply to ignore the precedent. Moreover, even assuming for the moment that Sandburg Village was wrongly decided, the lower court would still have erred in dismissing Sterling's malpractice action because a jury might well find that a defense counsel's failure to make use of so obviously favorable a precedent in his Circuit constitutes breach of the attorney's standard of due care.
 
 
 27
 In short, Sterling has presented a strong case that defendant counsel failed the manufacturer at trial by letting P & E's tying claim go to a jury without forcing the distributor to prove there was a substantial danger that Sterling would acquire market power in electric motors. Of course, the extent to which this failure prejudiced Sterling's defense is for the trier of fact to determine. Today's decision is narrow. We do not decide whether proof of tied market power is now required in this Circuit, only that Sandburg Village required market power, and that lawyers practicing in the Northern District of Illinois in 1985 were bound by its dictates. For the foregoing reasons, we reverse the judgment below and remand for further proceedings consistent with this ruling.
 
 
 
 [1]
 Our prior opinions are reported in 826 F.2d 712 (1987) and 866 F.2d 228 (1988)
 
 
 [2]
 Even if the inquiry did turn on 1992 antitrust law, it is far from clear that tied market power is not required, as the lower court concluded. No Supreme Court case has resolved the issue. The most recent tying case from the High Court, Eastman Kodak Co. v. Image Technical Services, Inc., --- U.S. ----, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), turns on other issues but affirms a Ninth Circuit decision that found market power in the tied product market
 
 
 [3]
 Tying arrangements are traditionally held to be per se violations of the antitrust laws. International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20. The per se rule operates basically as an assumption that an activity violates the antitrust laws without delving into the particulars of the market in question. The notion is to avoid a burdensome, expensive inquiry into market conditions where the likelihood of anticompetitive conduct is great. Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 15-16 n. 25, 104 S.Ct. 1551, 1560 n. 25, 80 L.Ed.2d 2. However, per se analysis in the tying context does, in fact, require an inquiry into economic conditions and effects. Thus, the per se doctrine as applied to tying cases has occasioned much criticism for "incur[ring] the costs of a rule-of-reason approach without achieving its benefits: the doctrine calls for the extensive and time-consuming economic analysis characteristic of the rule of reason, but then may be interpreted to prohibit arrangements that economic analysis would show to be beneficial." Id. at 34, 104 S.Ct. at 1570 (O'Connor, J., concurring). In any event, Sandburg Village requires a showing of market power in the tied market under both the per se and more forgiving rule-of-reason standards