JOSEPHINE CASTORENA, Plaintiff-Appellant, v. BROWNING-FERRIS INDUSTRIES OF ILLINOIS *et al.*, Defendants-Appellees.

Second District   No. 2—90—1049

Opinion filed August 9, 1991.

GEIGER, J., specially concurring.

Caluwaert, Panegasser & Hancock, of Elmhurst (Daniel J. Kordik, of counsel), for appellant.

Coleman & O'Halloran, of Chicago (John M. O'Halloran, of counsel), for appellees Browning-Ferris Industries of Illinois and Don Grotz.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, Josephine Castorena, filed a four-count amended complaint against the defendants, Browning-Ferris Industries (BFI), the City of Elmhurst (City) and Don A. Grotz (Grotz). The amended complaint alleged that plaintiff was injured when the car driven by Grotz, in which she was a passenger, struck a dumpster belonging to BFI which was on a roadway controlled by the City. Following the close of the plaintiff's case, the trial court directed a verdict in

favor of BFI and the City. The jury returned a verdict in favor of plaintiff and against Grotz (an uninsured motorist) in the amount of $164,280. Plaintiff appeals from the trial court's order directing the verdict in favor of BFI and the City. A summary of the trial testimony pertinent to the issues raised on appeal follows below.

Plaintiff testified that at approximately 9 p.m. on October 2, 1987, she accompanied Grotz, a friend of hers, to the Eden Lanes, where he participated in a bowling league. At the end of the evening, Grotz and she were driving to Grotz's parent's home to bury plaintiff's pet hamster which had died that morning. Plaintiff noticed nothing unusual about the way Grotz was driving or the way he spoke. However, plaintiff also testified that Grotz and she did not really converse on the way to his parents, as she was still upset about the death of her pet and was quietly sobbing.

Plaintiff testified further that the weather conditions were cold and dry. It was about 2 a.m. in the morning of October 3, 1987, and it was dark. She noted nothing unusual about how Grotz was operating the vehicle as it proceeded northbound on Spring Road in Elmhurst. She had no indication that an accident was about to happen until she felt the impact of the vehicle striking something, and she was thrown forward. She did not see what the vehicle struck prior to the impact, but afterwards she saw a large dumpster in the northbound lane of Spring Road. She did not recall if Grotz applied his brakes. She did not notice if any streetlights were on, just that it was dark. She did not observe any barricades or warning lights at the scene.

On cross-examination, plaintiff testified that she had not gone down Spring Road prior to the time of the accident. The headlights of the Grotz vehicle were working, and there was nothing to obstruct her view out the windshield. As far as she knew, the brakes on Grotz's vehicle functioned. As the vehicle turned onto Spring Road, she was looking out of the passenger window. After the accident, she was assisted into a residence on Spring Road. As she looked out of the window of the residence, she observed a "square black thing." In the lights from the ambulance, she was able to recognize that it was a dumpster. She identified a photograph of the dumpster which also showed a lightpost and two signs. She did not know whether the light was on or off, just that it was very dark. The dumpster was very large. There were no trees or bushes to obstruct the view of the dumpster.

On redirect, plaintiff testified that there were large trees around the light pole which covered the view of the light pole.

Donald Swierenga testified as an adverse witness that on October 3, 1987, he was the operations manager for BFI. His duties included the operating aspect of the Melrose Park site, fulfilling contractual obligations and making sure BFI services were rendered in accordance with customer requirements. Prior to being operations manager, he was the safety manager at BFI, and his duties included responsibility for BFI's safety program.

Swierenga testified that in October 1987 BFI was contracted to do work for the City. He identified a photograph of the dumpster struck by Grotz's vehicle as a 20-yard roll-off dumpster owned by BFI. In delivering dumpsters, it was BFI's practice to deliver a dumpster to a certain address, but it was the customer who determined where the dumpster was placed. The witness was uncertain whether the City was the customer in this case. He did recall that in 1987 the City requested dumpsters to be delivered to various locations as a result of heavy flooding during the late summer of 1987.

Swierenga further testified that the dumpster had a label on it which spelled out Browning-Ferris, Industries, Inc. He did not know what the label was made of or whether it illuminated when it was reflected upon. There was another label on the dumpster, which Swierenga was sure warned against putting hazardous substances into the dumpster. Both labels were predominately for advertising purposes. Swierenga admitted that at his deposition he had testified that the purpose of placing labels which contained reflective material was twofold, for identifying the owner and so that it could be seen in the evening. BFI did not put any warning lights out as it took the position that that was the responsibility of the customer.

On examination by counsel for BFI and the City, Swierenga confirmed his deposition testimony that he did not observe any reflectors on the dumpster in question other than the possibility that the labels contained reflective material. He could not tell from the photograph whether or not there were reflective materials in the labels.

The evidence deposition of William Gray was read into the record. Gray is and was on October 3, 1987, the director of public works for the City. His duties include the maintenance and safety of the City's streets. In August 1987, the City experienced a severe flood. As a result, the City ordered various dumpsters from BFI. The City would direct BFI where to locate the dumpsters. The City also ordered barricades from Navisco, Inc., or Warning Lights of Il-

linois. Gray denied that it was the City's duty to barricade the dumpsters, although he admitted that it was part of his job to put up signs warning of obstructions in the City's streets. There is a City inspector who inspects to see if the barricades are in place but does not provide the barricades.

Gray testified further that, after the flood in August 1987, the City took on the responsibility of barricading the dumpsters. However, he then testified that for the first two-week period following the flood, the City did not require barricades around the dumpsters because of the number of dumpsters and the fact that they were being filled and removed on a daily basis. Later in the fall, it was the responsibility of the homeowner to provide the barricade around a dumpster when it was in the street. According to Gray, Les Lodwick, a City employee, had as one of his responsibilities to inform the building department if he observed a dumpster without a barricade. The building department would then contact the homeowner to make sure the homeowner would provide a barricade. The City did send out inspectors to check the status of barricades in front of the dumpster.

Gray further testified that there was no City ordinance requiring the placement of barricades around the dumpster, nor did BFI have any requirement that dumpsters be barricaded. There were no reports that any of the streetlights in the immediate area of the dumpster were not working.

The parties stipulated, *inter alia*, that Grotz pleaded guilty to and was convicted of the offense of driving while under the influence of alcohol and, further, that the breathalyzer test was .2.

Carol Streje, a high school teacher, testified that on September 4, 1987, at approximately 10 p.m., she was returning to her home in Elmhurst. She turned right from Butterfield Road onto Spring Road, driving on the right-hand side of the road. She had driven that route many times. She noticed the dumpster when it was about five feet in front of her; she swerved to avoid it but could not.

Ms. Streje further testified that it was dark. There was a streetlight past the dumpster but no light directly above the dumpster. There were no barricades or flashing lights in front of the dumpster, nor were there any reflectors on the dumpster. The dumpster was in front of a residence around 1021 and 1025 Spring Road. At the time of the accident, she was traveling at a speed of about 25 miles per hour, which is the speed limit in that area. She had had nothing alcoholic to drink that evening. She did apply her brakes prior to hitting the dumpster.

Ms. Streje further testified that after the accident she walked to a nearby Shell Service Station and reported the accident to Officer Lenneweh.

Officer Richard Lenneweh, a police officer for the City, testified that at approximately 10 p.m. on September 4, 1987, he was at a service station at Butterfield Road and Spring Road in Elmhurst, when a woman informed him that she had been involved in an accident. He went to the scene of the accident and observed a vehicle which had struck a dumpster located in the roadway. The officer did not observe any lights or barricades in front of the dumpster nor any reflectors on the dumpster. There was a placard on the side of the dumpster indicating it was owned by BFI. He made a report of the accident.

After plaintiff had rested her case, both the City and BFI moved for a directed verdict. In the case of the City, the trial court found that there was no liability on the part of the City under section 3—104 of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1987, ch. 85, par. 3—104). The trial court also found that BFI had no duty to anticipate that Grotz would be operating a vehicle while legally intoxicated. The trial court entered a directed verdict in favor of both the City and BFI. This appeal followed.

Plaintiff contends, first, that the trial court erred in granting a directed verdict in favor of the City on the basis of section 3—104. She relies primarily on *Janssen v. City of Springfield* (1980), 79 Ill. 2d 435.

The City takes the position that *Janssen* is no longer controlling because it was decided under a previous version of section 3—104 that provided that a municipality was not liable for the failure to provide traffic warnings unless they were necessary to warn of a condition endangering the safe movement of traffic and not reasonably apparent to or anticipated by a person exercising due care. (See Ill. Rev. Stat. 1973, ch. 85, par. 3—104(b); *Newsome v. Thompson* (1990), 202 Ill. App. 3d 1074, 1078.) Subsection (b) was eliminated from the statute effective November 25, 1986 (Ill. Rev. Stat. 1987, ch. 85, par. 3—104).

■ The version of section 3—104 relevant to the case at bar provides as follows:

"Neither a local public entity nor a public employee is liable under this Act for an injury caused by the failure to *initially* provide regulatory traffic control devices, stop signs, yield right-of-way signs, speed restriction signs, distinctive road-

way markings or any other traffic regulating or warning sign, device or marking, signs, overhead lights, traffic separating or restraining devices or barriers." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 85, par. 3—104.) The deletion of subsection (b) from section 3—104 eliminated the liability in the event such devices were necessary to warn against "a condition which endangered the safe movement of traffic, and which would not be reasonably apparent to or anticipated by a person in the exercise of due care." (Ill. Rev. Stat. 1973, ch. 85, par. 3—104(b).) Subsection (a) (now section 3—104), which previously had dealt only with regulatory signs, now includes warning signs as well. Thus, although the deletion of subsection (b) appears at first blush to eliminate *all* liability for the failure to provide warning signs, section 3—104 only provides immunity for the failure initially to provide such signs.

In the cause before us, the plaintiff introduced evidence of a similar accident in which a vehicle driven by Carol Streje struck a dumpster near the same location as the accident involving the plaintiff. The Streje accident occurred one month prior to the accident involving plaintiff, and an accident report was filed by the Elmhurst police. Thus, although the City was immune from liability under section 3—104 for failing initially to place signs warning of the presence of the dumpsters on Spring Road, once the City had notice as a result of the Streje accident of the need for such warning signs, the immunity under section 3—104 was no longer available to the City.

■ Recently in *Dinges v. Gabardi* (1990), 202 Ill. App. 3d 732, this court rejected the argument that due to the deletion of subsection (b) from section 3—104 the decision in *Janssen* was no longer controlling. We relied on the language in *Janssen* to the effect that the duty to warn arose from the long-recognized obligation of governmental units to maintain public highways within its boundaries in a safe condition. (*Janssen*, 79 Ill. 2d at 450; *Dinges*, 202 Ill. App. 3d at 736.) In light of our decision in this case, we modify the view expressed in *Dinges* and hold that under section 3—104, while a public entity or public employee is immune from liability for initially failing to provide signs warning of a dangerous condition, after there has been notice to the public entity or public employee that such a dangerous condition exists, the immunity no longer exists. We note that in *Newsome v. Thompson*, the Appellate Court, First District (third division), reached a different result. However, in that case there was no evidence of previous accidents that would have

put the City of Chicago on notice of a dangerous condition as was the situation in the case at bar. Therefore, we distinguish *Newsome* on that basis.

We conclude, therefore, that the trial court erred in granting the City's motion for a directed verdict on the basis of section 3—104.

Next, plaintiff contends that the trial court erred in finding as a matter of law that it was not foreseeable that an intoxicated driver would, while operating a motor vehicle at night, strike an unilluminated dumpster located on a city street.

■■ The question of proximate cause is ordinarily one of fact for the jury to resolve. (*Boylan v. Martindale* (1982), 103 Ill. App. 3d 335, 341.) Yet, it is well established that if an alleged negligent act does nothing more than furnish a condition making the injury possible, and such condition, by the subsequent independent act of a third party, causes the injury, the two acts are not concurrent, and the condition will not be the proximate cause of the injury. (*Boylan*, 103 Ill. App. 3d at 342.) The *Boylan* court set forth the test for distinguishing between a proximate cause and a condition as articulated by the supreme court in *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 316-17, as follows:

> " 'The cause of an injury is that which actually produces it, while the occasion is that which provides an opportunity for the causal agencies to act. [Citation.] The test that should be applied in all cases in determining the question of proximate cause is whether the first wrongdoer might have reasonably anticipated the intervening cause as a natural and probable result of the first party's own negligence. [Citation.] If the act of a third party is the immediate cause of the injury and is such as in the exercise of reasonable diligence would not be anticipated and the third person is not under the control of the one guilty of the original wrong, the connection is broken and the first act or omission is not the proximate cause of the injury. There may be more than one proximate cause of an injury. But if two wholly independent acts, by independent parties, neither bearing to the other any relation or control, cause an injury by one creating the occasion or condition upon which the other operates, the act or omission which places the dangerous agency in operation is the efficient intervening cause that breaks the causal connection and makes the other act or omission the remote and not the proximate

cause of the injury.' " 103 Ill. App. 3d at 342, quoting *Merlo*, 381 Ill. at 316-17.

In directing the verdict for BFI, the trial court relied on *Boylan* and *Jeanguenat v. Zibert* (1979), 78 Ill. App. 3d 948. In *Boylan*, the plaintiff was a passenger in a vehicle whose driver disregarded a red light while rushing to the hospital and was struck by the defendant's vehicle. Plaintiff sued the city on the theory that the cross traffic could not be seen because of the city's failure to remove or trim trees and bushes. The reviewing court upheld the trial court's granting of summary judgment in favor of the city on the basis that, at worst, the city had only permitted a condition and that the disregard of the red light was the proximate cause of plaintiff's injuries.

In *Jeanguenat*, plaintiff was a passenger in a vehicle driven by Mills, who had consumed some 10 to 15 beers. Mills' vehicle struck Zibert's vehicle, which was parked in a "no parking" zone and was blocking the roadway. Mills admitted that at the time of the collision he was in conversation with the plaintiff and was not looking at the road. Mills further admitted that had his attention been on the road, the collision could have been avoided.

Both *Boylan* and *Jeanguenat* are distinguishable from the case at bar. In *Boylan*, the fact that the city allowed the bushes and trees to be overgrown would not have mattered had the driver of the vehicle in which plaintiff was a passenger obeyed the traffic signals. In *Jeanguenat*, while Zibert was negligent in parking in a "no parking" zone and blocking traffic, Mills, the driver of the vehicle that struck Zibert's vehicle, admitted that he could have avoided the collision if he had been watching the roadway.

In the case at bar, the plaintiff testified that she was not really paying attention to Grotz's driving but had noticed nothing unusual. Unlike *Jeanguenat*, Grotz was not distracted by conversation, as plaintiff was looking out the passenger window mourning her dead pet. Although testifying that the streetlights were working, plaintiff testified that it was dark. While the parties stipulated to the legal intoxication of Grotz, there was testimony from Carol Streje that while driving, she had struck a dumpster and that she had not consumed any alcohol at the time of her accident.

Verdicts ought to be directed only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based upon that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.

Given the evidence of a similar accident without the alcohol element together with the lack of evidence as to any erratic or unusual driving on the part of Grotz, we cannot say that Grotz's driving while intoxicated was an independent act sufficient to break the causal chain and relieve BFI of liability for plaintiff's injuries. While the trial court did direct a verdict for plaintiff on liability as to Grotz, there may be more than one proximate cause of an injury. *Merlo,* 381 Ill. at 317.

We conclude, therefore, that the trial court erred in directing a verdict in favor of BFI.

The judgment of the circuit court is reversed, and the cause is remanded as to the City and BFI.

Reversed and remanded.

BOWMAN, J., concurs.

JUSTICE GEIGER, specially concurring:
I agree with the majority that the trial court here erroneously granted the City a directed verdict. I do not, however, subscribe to the majority's reasoning to reach that conclusion.

The majority's analysis depends upon *Dinges v. Gabardi* (1990), 202 Ill. App. 3d 732. Considering the far-reaching implications of *Dinges* (see *Dinges,* 202 Ill. App. 3d at 738-40 (Geiger, J., dissenting)), and the presence of a compelling alternative basis for reaching the result in this decision, I would not base my decision on the City's receipt of notice of the existence of a hazardous condition and its subsequent failure to erect a barricade.

As the majority here modifies and applies *Dinges,* the defendant City faces liability for an intoxicated driver's collision with a dumpster. That liability is despite the City's failing to ever warn of the hazard and is without regard for City action in creating the hazard. Under the majority's analysis, the potential liability here is premised on the City's failure to warn motorists of the dumpster placement, and it arises because another motorist's earlier dumpster collision gave notice that a dangerous condition existed.

Unlike the majority, I do not consider notice to be the critical fact in this case. Rather, I would rely upon the evidence here that the City took an active role leading up to the accident at issue. In this case, the City was not merely a passive body failing to provide warning for a condition that arose, without its control, on a City roadway. Rather, there was evidence that the City acted to create

338

the condition: it ordered dumpsters and specified where they should be placed.

The City is, of course, subject to a general duty to exercise ordinary care in maintaining its property in a reasonably safe condition. (See Ill. Rev. Stat. 1989, ch. 85, par. 3—102.) In this case, there is evidence that the City violated that duty by creating and controlling the hazard at issue. Under these circumstances, I would find that despite the fact that the City did not undertake to warn of a traffic hazard, its general section 3—104 immunity (Ill. Rev. Stat. 1989, ch. 85, par. 3—104) is not determinative. The City's exposure to liability properly results not from its failure to warn of a hazard, but from its active role in creating the hazard, in violation of its duty to maintain safe conditions.