**A.O. SMITH CORPORATION and 16752 Corporation, f/k/a Sterling Electric, Inc., Plaintiffs,**

v.

**LEWIS, OVERBECK & FURMAN, Douglas A. Lindsay, Robert A. Subkowsky and Robert A. Wolz, Defendants.**

No. 90 C 5160.

United States District Court, N.D. Illinois, E.D.

Oct. 29, 1991.

Scott W. Hansen, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, Wis., for plaintiffs.

George W. Spellmire, Thomas P. McGarry, Hinshaw & Culbertson, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This legal malpractice action turns on the intricacies of antitrust law. A.O. Smith Corporation ("Smith") and 16752 Corporation, formerly known as Sterling Electric, Inc. ("Sterling"), lost an antitrust tying case in which members of the firm of Lewis, Overbeck & Furman ("Law Firm") served as Sterling's trial counsel. Law Firm failed to raise a certain legal argument at trial, after which the jury returned a verdict and multimillion dollar trebled damage award against Sterling—a verdict since sustained after tortuous passage through the appellate process.

Sterling [1] now brings an issue-narrowing motion under Fed.R.Civ.P. ("Rule") 16, asking for a pretrial ruling on the existence of a proximate cause relationship between the claimed malpractice and Sterling's injury. For the reasons stated in this memorandum opinion and order, this Court decides the motion against Sterling and dismisses the action.

### Facts and Procedural History

Our Court of Appeals has twice rehearsed the details of the underlying antitrust action, which was captioned *Parts & Electric Motors, Inc., v. Sterling Electric, Inc.:* first at 826 F.2d 712 (7th Cir.1987) (*"P & E I"*) and again at 866 F.2d 228 (7th Cir.1988) (*"P & E II"*). This Court's colleague Honorable James Holderman had also discussed the facts at length in his original memorandum opinion and order, No. 83 C 2349, 1986 WL 4716 (N.D.Ill. April 14, 1986) (LEXIS, Genfed library, 7 Dist file) ("Holderman Opinion"). Only a spare outline of those details is needed here.

---

1. Although Smith is the first-named plaintiff in this action, for the sake of consistency with the reported decisions in the underlying antitrust case this opinion refers to plaintiffs collectively as "Sterling," which unlike Smith was a party to the antitrust action. In the interest of simplicity this opinion also speaks of defendants collectively as "Law Firm," even though three of its partners are also sued individually.

Sterling made motors and parts. Parts and Electric Motors, Inc. ("P & E") distributed them under contract with Sterling. Sterling pressured P & E to buy more motors or face losing its right to buy both parts and motors. When P & E did not increase its motor purchases to Sterling's satisfaction, Sterling cancelled the contract, depriving P & E of the opportunity to sell both products. P & E then sued Sterling for violations of the antitrust laws, claiming that the linkage between parts and motors constituted illegal "tying." Armed with Judge Holderman's jury instructions, a jury returned a verdict for P & E and assessed actual damages of $1,231,992, which by law were then trebled to $3,695,-976.

Sterling then moved for judgment notwithstanding the verdict.[2] Judge Holderman granted the motion, ruling that the case should not have gone to the jury because P & E had failed to present evidence on the alleged element of "tied market power": whether Sterling's requirement that P & E buy more motors in order to continue selling parts created a substantial threat that Sterling would acquire market power in motors (Holderman Opinion at 11). *P & E I* reversed the grant of j.n.o.v. and held that Sterling had failed at trial to preserve the issue of tied market power. On remand Judge Holderman then denied Sterling's motion for a new trial, and *P & E II* affirmed that decision. Sterling's last

hope in the antitrust case expired when the United States Supreme Court denied certiorari (493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989)). It then paid the judgment with interest.

Sterling then trained its sights on Law Firm. On September 5, 1990 Sterling filed this diversity action charging Law Firm with legal malpractice and breach of contract.[3] Law Firm filed a motion to dismiss in lieu of an answer, in response to which this Court's October 16, 1990 memorandum opinion and order (1990 WL 179871, 1990 U.S. Dist. LEXIS 15120) dismissed the breach of contract claim and directed Law Firm to answer the malpractice claim.

On June 16 of this year Sterling requested a pretrial ruling on the issue of proximate cause. It did so via a mislabeled "motion for partial summary judgment" under Rule 56. On June 20 this Court issued a brief memorandum (1991 WL 119130, 1991 U.S. Dist. LEXIS 8481) expressing its willingness to consider the motion instead as an issue-narrowing motion under Rule 16—that is, as an effort to narrow the scope of issues requiring discovery and trial.[4] Law Firm's counsel did not object to that approach, but they asked that this Court also consider the issue of whether tied market power was an element of the tying claim in addition to the issue of proximate cause. In effect, then, the parties have submitted a joint request for pre-

**2.** At some point—apparently between the close of trial and the filing of the motion for j.n.o.v.—Kirkland & Ellis began to serve as co-counsel for Sterling. Kirkland & Ellis served as counsel of record in the antitrust appeals before our Court of Appeals, but it does not represent Sterling in the current malpractice action.

**3.** Both Smith and Sterling are Delaware corporations, with Smith's principal place of business being in Wisconsin and with Sterling (now inactive) having no place of business at all. All the partners in Law Firm (both named and unnamed as defendants) are Illinois citizens.

**4.** "Partial summary judgment" in the present context is to the Federal Rules as Bigfoot is to zoology—a frequently "sighted" but nonexistent animal. If a ruling for the moving party in a Rule 56 summary judgment motion does not dispose of the entire case, or of an entire cause

of action within a larger case, then it is not a Rule 56 motion at all. Here even if Sterling wins on causation it must still prove negligence in order to recover. Pretrial resolution of this sort of significant but not necessarily dispositive legal issue is more comfortably placed under the rubric of Rule 16, which grants the trial judge broad discretion to shape the course of litigation. It may be noted parenthetically that one of the purposes sought to be accomplished by the proposed major revision of Rule 56 that was dropped from the originally proposed June 12, 1989 package of Rules amendments by the Committee on Rules of Practice and Procedure of the Judicial Conference (see pages 105–20 of the report of the Advisory Committee on Civil Rules, reprinted at 110 S.Ct. 370–85 in the section of that volume preceding the reporting of Supreme Court decisions) would have brought the current motion within the scope of that Rule.

trial rulings on the questions of proximate cause and tied market power.

## Legal Malpractice

Illinois law provides the rules of decision as to Sterling's malpractice claim—though not of course as to the subset of substantive antitrust issues. To prove legal malpractice in Illinois a plaintiff must establish five elements: (1) an attorney-client relationship; (2) a duty arising out of that relationship; (3) breach of duty; (4) causation; and (5) actual damages (*Land v. Auler*, 186 Ill.App.3d 382, 384, 134 Ill.Dec. 330, 332, 542 N.E.2d 509, 511 (4th Dist. 1989)). This motion concerns the fourth element.

It is worth noting that of the elements *not* contested in the present motion, only breach of duty (element 3) is likely to be the subject of dispute. Obviously an attorney-client relationship existed (element 1), from which as a matter of law there arose a duty to exercise a reasonable degree of care and skill in the representation (element 2). Injury (element 5) clearly resulted from the jury's damage award. Thus a decision in Sterling's favor on proximate cause would leave open for trial just one question: whether attorneys exercising a reasonable degree of care and skill would have preserved the issue of tied market power.

## Proximate Cause

Proximate cause ordinarily poses an issue of fact for the jury (*Castorena v. Browning-Ferris Industries of Illinois*, 217 Ill.App.3d 328, 160 Ill.Dec. 309, 313, 577 N.E.2d 185, 189 (2d Dist.1991)). But *Wilson v. Bell Fuels, Inc.*, 214 Ill.App.3d 868, 873, 158 Ill.Dec. 406, 410, 574 N.E.2d 200, 204 (1st Dist.1991) teaches that is not always so:

> Proximate cause becomes a question of law, however, when the material facts are undisputed and there can be no difference in judgment of reasonable men as to the inferences to be drawn from them.

This action resembles many other legal malpractice cases in that all the "material facts" involved in determining proximate cause are to be found within hard covers in the Federal Reporter. When proximate cause depends in essence upon "whether the client would have received a more favorable judgment [on appeal]," then "[c]learly, a judge is in a much better position [than a jury] to make these determinations" (*Daugert v. Pappas*, 104 Wash.2d 254, 704 P.2d 600, 603-04 (1985), citing cases from numerous jurisdictions; 2 Roland Mallen & Jeffrey Smith, *Legal Malpractice* § 27.10, at 658 (3d ed.1989)).

Sterling asserts that Law Firm's failure to preserve the issue of tied market power for post-trial motion or appeal was the proximate cause of its loss—the only instance of malpractice that it alleges (Amended Complaint ¶ 37). For that malpractice action to succeed, it must be clear that a post-trial motion or appeal alleging P & E's failure of proof on tied market power would have resulted in a judgment for Sterling in the antitrust case. As *J & G Restaurant, Inc. v. Regas*, 156 Ill.App.3d 834, 838, 109 Ill.Dec. 396, 398, 510 N.E.2d 17, 19 (1st Dist.1987) put it, "the client must establish that but for [the attorney's] neglect, he would have prevailed on appeal." Where "a further appeal would be futile," failure to preserve or pursue the appeal cannot constitute malpractice (*Chicago Red Top Cab Ass'n, Inc. v. Gaines*, 49 Ill. App.3d 332, 7 Ill.Dec. 167, 364 N.E.2d 328 (1st Dist.1977)).

Sterling R.Mem. 1-2 offers the Holderman Opinion as essential proof of causation:

> We know how Judge Holderman would have decided the original case but for defendants' waiver.

That argument seems to presuppose that Sterling can prove malpractice regardless of the legal sufficiency of its argument about tying. But the cases make clear that where proximate cause turns on the determination of a purely legal issue, the actions of the initial trier of fact prove nothing. Jurisdictions that have spoken on that issue have uniformly declared that the trial judge in a malpractice case must reconsider legal issues raised in the underlying case

from the standpoint of the "reasonable judge" (see, e.g., *Cornett v. Johnson*, 571 N.E.2d 572, 575 (Ind.App.1991); *Helmbrecht v. St. Paul Ins. Co.*, 122 Wis.2d 94, 362 N.W.2d 118, 124–26 (1985)). This Court's job is to engage in a dispassionate and objective reconsideration of any disputed legal issues from the antitrust case. So while the reasoning of the Holderman Opinion may persuade this Court, the fact that Judge Holderman granted j.n.o.v. is of no weight.[5]

By now it should be clear that the issues of causation and tied market power, though presented as two independent issues by the parties, really merge. If tied market power was indeed an essential element of P & E's case, then Sterling's failure to preserve the issue necessarily proves proximate cause. If tied market power was not such an element, there endeth the malpractice case, for the failure to make an incorrect and therefore ineffective legal argument cannot constitute malpractice. In sum, the legal sufficiency vel non of the underlying antitrust claim is all that requires decision today.

### Tied Market Power in General

Plaintiff in a tying case typically alleges that a seller has required it to buy one product in order to buy another. As Justice O'Connor explained in her concurring opinion in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 33, 104 S.Ct. 1551, 1569, 80 L.Ed.2d 2 (1984) (emphasis in original):

> Tying is a form of marketing in which a seller insists on selling two distinct products or services as a package. A supermarket that will sell flour to consumers only if they will also buy sugar is engaged in tying. Flour is referred to as the *tying* product, sugar as the *tied* product.

Here parts were the tying product, motors the tied product.

Courts usually categorize tying as a per se violation of the antitrust laws—as falling into that category of practices so typically instituted for anticompetitive ends that the courts do not require a plaintiff to prove anticompetitive effect. All the plaintiff need prove is that the defendant actually engaged in the forbidden practice. Anticompetitive practices not falling into the per se category are evaluated instead under the "rule of reason," under which the court evaluates in detail the actual costs and benefits of the allegedly anticompetitive practice (*Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Development Co.*, 758 F.2d 203, 210 & n. 5 (7th Cir.1985)).

In this instance *P & E I*, 826 F.2d at 715 discloses that Judge Holderman instructed the *P & E* jury alternatively under principles applicable (1) to alleged per se violations and (2) to alleged violations under a rule of reason analysis (both discussed in greater detail hereafter). Importantly the jury was given and it answered five special interrogatories setting out the contested elements of a per se case—all of them save the added element urged by Smith (market power in the tied product)—and each answer was in favor of P & E. Hence so long as per se treatment of tying remains viable and does not require a showing of that added element, Law Firm's failure to argue for inclusion of such an element presents a no-harm no-foul situation.

Over the years the classification of tying as a per se violation has withstood a steady stream of scholarly and judicial attacks. Critics' charges fall into two general categories.

First, per se classification is said to be unjustified because economic analysis demonstrates that many tie-in arrangements

---

5. This Court approaches that task of reconsideration with a good deal of diffidence. Those of us who labor in the District Court vineyards are rarely called upon to sit in the equivalent of appellate scrutiny of the views of our own respected colleagues. Thus when we Illinois District Judges sit by designation with our Court of Appeals, only cases originating in Indiana or

Wisconsin are placed on the docket for argument. About the only occasionally-encountered instances that are comparable to the present one are those other situations in which a case is transferred from one District Judge's calendar to another's (for any one of a number of reasons) and the second judge is then asked to revisit an earlier substantive ruling by the first.

have no adverse effects on competition. Just the opposite is suggested: tie-ins can enhance efficiency and benefit consumers in various ways—through the creation of economies of scale, through evasion of price regulation, and through certain forms of price discrimination (Robert Bork, *The Antitrust Paradox* 365–81 (1978)). As former Judge Bork puts it (*id.* at 365):

> [I]t is safe to say that suppression of competition is the one function not accomplished by the [tying] arrangements the Court has struck down.

Proper analysis, critics argue, would focus on the real economic impact of tying arrangements in the market for the tied product (see, e.g., *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 674 (7th Cir.1985).

Second, per se classification is said to be a misnomer because courts do not really grant recovery every time a plaintiff shows the existence of a tying arrangement. Courts tend to uphold "package transaction[s] with substantial justifications or few apparent harmful effects," even though the arrangements may nominally seem to violate the law (*Johnson v. Nationwide Industries, Inc.*, 715 F.2d 1233, 1237 (7th Cir.1983), quoting Phillip Areeda, *The "Rule of Reason" in Antitrust Analysis: General Issues* 30–32 (Fed.Judicial Center 1981)). *Johnson* found that a management contract linked to the sale of a condominium unit did not constitute a tie-in because the contract was of "reasonable" duration. It again quoted Professor Areeda when he said (*id.*):

> Of course, it might be cleaner and clearer to say that harmful effects are a prerequisite for illegality or that justified tie-ins are lawful, but the immediate point is that courts achieve the same end by varying the definition of a per se classification.

Another critic aptly notes that "[t]he *per se* rule against tie-ins is sometimes called a 'soft core' *per se* rule because the plaintiff must define a relevant market and show that the defendant has a certain amount of market power [in the market for the tying product]" (Herbert Hovenkamp, *Econom-*

*ics and Federal Antitrust Law* § 8.3, at 220 & n. 12 (1985)). See also *USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 511 (7th Cir.1982).

In *Jefferson Parish* critics of the per se rule established a beachhead in the Supreme Court. There the Court held that a hospital could require all its patients to use a particular firm of anesthesiologists with whom the hospital had an exclusive contract. All nine Justices agreed that such an arrangement did not constitute an illegal tie-in between hospital services and anesthesiology services, but the Court produced three separate opinions to explain why.

Speaking for a five-Justice majority, Justice Stevens found the hospital's arrangement with its anesthesiologists acceptable under the traditional rules of tying (466 U.S. at 12, 104 S.Ct. at 1558):

> Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

Absent that sort of proof, a plaintiff could still prove a tying arrangement illegal under the rule of reason (*id.* at 18, 104 S.Ct. at 1561). Rule of reason arguments have long been available to tying plaintiffs (see, e.g., *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 499–500, 89 S.Ct. 1252, 1256–57, 22 L.Ed.2d 495 (1969)), though plaintiffs typically argue a rule of reason approach in the alternative—hoping that the court before which they appear will find in their favor under the less burdensome per se approach.

Justices Brennan and Marshall filed a brief concurrence in *Jefferson Parish*, pointing out that Congress had stood by silently for years while the courts continued to classify tying as a per se violation. Traditional principles of statutory construc-

tion therefore suggested that Congress and not the Court should undertake any basic revisions in antitrust policy, however desirable the revisions might be (466 U.S. at 32, 104 S.Ct. at 1568 (Brennan, J., concurring)).

This malpractice case has its genesis in the third *Jefferson Parish* opinion, a concurrence by Justice O'Connor that drew three other votes. That opinion sought to restructure tying law from the ground up, taking account of the generations of academic and judicial criticism that had followed the adoption of the per se doctrine. Justice O'Connor suggested that the Court do away with the per se label for tying cases (*id.* at 35, 104 S.Ct. at 1570 (O'Connor, J., concurring in the judgment)) and substitute instead a three-part analysis requiring proof of "[1] market power in the tying product, [2] a substantial threat of market power in the tied product, and [3] a coherent economic basis for treating the products as distinct" (*id.* at 41, 104 S.Ct. at 1573 (brackets inserted by this Court)). Where those threshold elements are satisfied, courts should then invoke "the rule-of-reason balance.... The ultimate decision whether a tie-in is illegal under the antitrust laws should depend upon the demonstrated economic effects of the challenged agreement" (*id.*). Examined under that approach, the contract at issue in *Jefferson Parish* passed muster.

Most of the current controversy revolves around the second part of Justice O'Connor's three-part test: the requirement of "a substantial threat of market power in the tied product." Market power is the "power to raise prices significantly above the competitive level without losing all of one's business" (*Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 745 (7th Cir.1982); see also Hovenkamp § 3.1, at 57). Justice Stevens' majority opinion in *Jefferson Parish* did not impose that requirement. *P & E I*, 826 F.2d at 718 quoted that majority opinion (466 U.S. at 14, 16, 104 S.Ct. at 1559, 1560) in stating:

The majority appears to require only that market power in the tying product be "used to impair competition on the merits in another market," and that "a substantial volume of commerce [be] foreclosed thereby."

■ Although the tests articulated by Justices Stevens and O'Connor may not sound terribly different to the uninitiated, the distinction between them is all-important. Courts test impairment of competition in the tied product market (the majority requirement) by measuring only the volume of commerce affected (*P & E I*, 826 F.2d at 716 & n. 2). Proof of a substantial threat of market power (Justice O'Connor's suggested requirement) is a "more stringent" standard (*305 East 24th Owners Corp. v. Parman Co.*, 714 F.Supp. 1296, 1308 & n. 9 (S.D.N.Y.1989)), under which the court typically examines a multitude of complex factors such as market share, uniqueness of the product and the definition of the product market as contrasted with the geographic market (*Will*, 776 F.2d at 671–72; see generally Hovenkamp ch. 3). Of course a single tying arrangement may create both anticompetitive impact and a substantial threat of tied market power. But under the majority view as expressed by Justice Stevens, courts may find an antitrust violation on proof of the former consequence alone.

### Tied Market Power in the Seventh Circuit

When all is said and done, this Court's present task is to construe our Court of Appeals' cases on tying—except of course as those cases might have been impacted by any *supervening* Supreme Court decision,[6] or might perhaps have been faithless to any *earlier* Supreme Court decision.[7] *Sandburg* was the leading case in this Circuit at the time of the underlying antitrust trial and is therefore the logical starting place. Sterling contends that *Sandburg* clearly established the tied market power element of a per se tying claim.

---

6. Neither party suggests the existence of any such later decision.

7. As reflected in the text discussion that follows, the issuance of a holding to that effect is essentially the invitation that Law Firm extends to this Court.

Law Firm counters that *Sandburg* (as well as *Will*, a case decided post-trial and cited extensively in the Holderman Opinion) simply ignored the *Jefferson Parish* majority opinion and therefore cannot bind this Court.[8] No Court of Appeals, Law Firm argues, may adopt a view of the law openly contrary to the views of a Supreme Court majority (Law Firm Mem. 3, 9, citing *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1922, 104 L.Ed.2d 526 (1989) and the more strongly worded disapproval voiced in Justice Stevens' dissent speaking for four Justices, *id.* at 486, 109 S.Ct. at 1923).

Law Firm's argument seems to concede that *Sandburg* and *Will* did establish tied market power—perhaps temporarily, perhaps wrongly—as an element of a per se tying claim in this Circuit at the time of trial. Nowhere in its filings before this Court does Law Firm seriously contend that *Sandburg* and *Will* were wrongly applied by Judge Holderman, who was obligated (as this Court would have been) to follow circuit law. Law Firm contends instead that *Sandburg* and *Will* were wrongly decided by our Court of Appeals.

It is the essential fictional scenario of the current malpractice claim, focusing as it does on a pure issue of law, that this Court must assume (1) that Law Firm had brought a timely motion on the tied market power issue, (2) that Judge Holderman had then decided the motion in Law Firm's favor, and (3) that the case had then gone up on appeal, where the correct law of tying would have prevailed. Of course, the far more than $6 million dollar question[9] is what view of the law is "correct." Sterling argues for the *Sandburg* and *Will* view.

Law Firm in effect asks this Court to reject *Sandburg* and *Will* and to assert the *Jefferson Parish* majority view as the law of the Seventh Circuit.

Institutional reasons dictate that a District Court should not seek to instruct its own Court of Appeals on antitrust law. As *United States ex rel. Shore v. O'Leary*, 833 F.2d 663, 667 (7th Cir.1987) put it succinctly:

> A lower court owes deference to those above it; ordinarily it has no authority to reject a doctrine developed by a higher court.

In any event, the job of the "reasonable judge" in a malpractice case is to decide the appeal as the reported cases suggest it would have been decided. If the correct resolution of the issue now before this Court does not require an analysis that goes beyond circuit law, then the roles of "reasonable judge" and District Judge may not conflict. Extended examination of the law of the Seventh Circuit is therefore the appropriate first step in determining the outcome of the hypothetical appeal.

■ Four decisions require scrutiny for that purpose: *Sandburg, Will, P & E I* and *P & E II*. Of those, all but *Sandburg* postdate the antitrust trial. Ordinarily legal inquiry in a malpractice case is frozen in time, limited to "the state of the law during the period of the disputed legal representation" (*Land*, 186 Ill.App.3d at 384, 134 Ill.Dec. at 332, 542 N.E.2d at 511). But in a case like this one, where deciding causation means deciding the likely results of an appeal to the Seventh Circuit, it would be foolish not to consider decisions of our Court of Appeals that followed closely

---

**8.** Law Firm all but accuses Judge Easterbrook, who as a lawyer also had been counsel for petitioner in *Jefferson Parish* and who then as a judge authored the *Will* opinion, of wilfully misreading *Jefferson Parish* in order to convert his personal views into law. That argument is as unacceptable as it is tactically senseless. On the first level, Judge Easterbrook's intellectual integrity is not at issue. And as for the second, if the matter were viewed solely in strategic terms (as it clearly cannot be), Law Firm could hardly expect Judge Easterbrook or his colleagues to agree with Law Firm's groundless accusation should the malpractice case go up on appeal.

**9.** Complaint ¶ 33 says that the interest accrued on the judgment, as of the time the Supreme Court had denied certiorari after *P & E II*, brought the amount of Smith's obligation to Sterling up to $5.844 million—so that was what Smith paid. Of course Smith's recovery against Law Firm, if it were successful here, would also include interest accrued during the more than two years that have elapsed since then. And Smith asks for an award of attorneys' fees as well.

upon the heels of the antitrust trial and that in two instances actually emerged from the appeal of that case. Those decisions obviously provide the best clues as to how the Court of Appeals would have resolved the hypothetical appeal now before this Court.

First, *Sandburg* held that the sale of condominium units by Company A, linked to a management contract with Company B, did not violate the tying laws. That arrangement withstood both per se and rule of reason analysis.

Writing for the Court of Appeals, Judge Flaum first listed the elements of a per se violation as traditionally defined by the Supreme Court (758 F.2d at 207, citing *Northern Pacific Ry. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958)):

> (1) the tying arrangement is between two distinct products or services, (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product, and (3) a not insubstantial amount of interstate commerce is affected.

Per se violations, the court ruled, require proof of Company A's economic interest in the sales of Company B—an element lacking there, where A and B were unaffiliated and A received no commission, rebate or profit-sharing payment of any kind from B.

*Sandburg* went on to evaluate plaintiff's claim under the rule of reason, considered in the alternative as per *Fortner* (758 F.2d at 210, citing *Jefferson Parish,* 466 U.S. at 36, 38, 104 S.Ct. at 1570, 1572 (O'Connor, J., concurring)):

> In monitoring the use of tie-ins, the goal of the antitrust laws in the tying context is to prevent the economically harmful effects of tie-ins in cases where a seller's power in the market for the tying product is used to create additional power in the market for the tied product. One of the threshold criteria that a plaintiff must satisfy under both the *per se* and rule of reason analyses in order to show that such an extension of the seller's

market power may pose a threat of economic harm and an unlawful restraint of trade is that there is a substantial danger that the tying seller will acquire market power in the tied product market.

Still the claim failed: A's lack of any economic interest in B's sales proved ipso facto that A could not be "using its market power in the tying product market to alter the competitive structure of the tied product market or ... to obtain a profit in a second market" (758 F.2d at 211).

In dispensing with the rule of reason claim, *Sandburg* relied principally not on Justice O'Connor's concurrence but on *Warner Management Consultants, Inc. v. Data General Corp.,* 545 F.Supp. 956 (N.D.Ill.1982). *Warner* predates *Jefferson Parish,* and in it this Court's colleague Honorable Prentice Marshall had applied traditional concepts of competitive injury— not the later-announced *Jefferson Parish* concept of tied market power (*id.* at 967) (citations omitted):

> The competitive injury classically associated with tying arrangements is that purchasers ... are precluded from entering the market for competing tied products. As a result, competitors and purchasers in the market for the tied product are injured by the tying arrangement.

That "classic" form of injury describes the foreclosure of commerce and not the exertion of market power by the seller.

Did *Sandburg,* in the longer passage quoted two paragraphs back, adopt the Justice O'Connor concurrence lock, stock and barrel as the law of the Seventh Circuit in per se cases? Sterling Mem. 4 argues as much. But the Court of Appeals analyzed the law on per se violations at length without even mentioning tied market power. Its list of the elements of a per se claim did not include tied market power among them. For that list of elements it cited *Northern Pacific,* a decision that antedated *Jefferson Parish* by over three decades and that had been quoted for the same purpose by the Supreme Court's 1969 decision in *Fortner.* And *Sandburg* decided the per se claim before the Court of Appeals without reference to tied market power.

Furthermore, *Sandburg*'s section on the rule of reason appears to have cited Justice O'Connor's *Jefferson Parish* concurrence in dictum, as a statement of the broad policy goals of tying law—for which purpose the citation is wholly unobjectionable—and not as a binding statement of circuit law. This reading of *Sandburg* is persuasive for three reasons. It explains the opinion's reliance on *Warner Management*. It explains the opinion's apparent failure to reconcile the Justice O'Connor citation with the traditional list of elements of a per se claim offered earlier in the *Sandburg* opinion: Certainly Judge Flaum could not have meant to leave the two citations in conflict. And finally, this reading eliminates any possible tension between circuit law and Justice Stevens' majority opinion in *Jefferson Parish*.

It must be remembered that the need to look at a claimed antitrust violation through a rule of reason lens arises only if (as in *Sandburg*) plaintiff fails to establish liability in per se terms. Where as here liability *was* established by the jury's express findings under traditional per se analysis, the fallback rule of reason approach becomes no more than surplusage. This Court therefore concludes that *Sandburg*, read in isolation, did not establish tied market power as an essential element of a per se tying claim in this circuit. But because later cases might perhaps have altered that point of law, this opinion will go on to consider those cases.

As for *Will*, the plaintiffs there asserted both antitrust and contract claims. Only the former are relevant here. Defendant, a franchisor of accounting services, had pressured plaintiff franchisees to buy data processing services (the tied product) along with the right to provide services under the franchisor's aegis (the tying product). In the opening pages of his opinion Judge Easterbrook cited the *Jefferson Parish* majority opinion with approval not once but seven times. In a footnote (776 F.2d at 671 & n. 2) he noted the debate on tying law that engendered "close division on the rationale in *Hyde*," but he specifically said, "We need not join the debate, given the conclusions discussed below."

Indeed, Judge Easterbrook declared for the Court of Appeals (*id.* at 671 (emphasis added)):

[P]laintiffs' case has a fatal weakness. They did not establish market power. They failed as a matter of law. *This failure makes every other element of the anti-trust case irrelevant.*

It is necessary only to read the *Will* opinion to see that Judge Easterbrook referred there to market power over the tying product and not over the tied product. Plaintiffs produced no evidence of defendant's market share in the accounting field, nor did it produce adequate evidence that defendant provided unique services. Therefore plaintiffs lost (*id.* at 673).

Following that unambiguous statement of result and rationale, Judge Easterbrook then went on to quote *Sandburg*'s statement of Justice O'Connor's view in *Jefferson Parish* (*id.* at 674). Addressing that approach, and beginning his discussion offhandedly ("For that matter ..."), he noted that the defendant in *Will* could not even threaten to monopolize the market for data processing services. To reiterate: That statement followed seven approving citations to Justice Stevens' majority opinion in *Jefferson Parish*, a pointed refusal to engage in a debate on the policy of tying law and an express statement that all issues other than market power in the tying product were "irrelevant" to the decision. That is hardly the strategy of a willful judge seeking to displace Supreme Court law with his personal views, as Law Firm suggests (see n. 8).

In that context Judge Easterbrook could have offered the *Sandburg* discussion only by way of intellectual speculation—as a means of proving the utter morbidity of plaintiffs' case, which already lay inert before him. Dictum may not be susceptible to precise definition, but this Court knows it when it sees it. More to the point, this Court knows dictum when higher authority points it out (*P & E I*, 826 F.2d at 718):

The key statement in *Will*, 776 F.2d at 674, appears to be dictum since the *Will* court had already disposed of the appeal

by ruling that the plaintiff had failed to prove market power in the tying market. Hence Judge Easterbrook's citation to *Sandburg*, incorporating that case's citation to Justice O'Connor's concurrence in *Jefferson Parish*, simply cannot be construed as the law of the *Will* case or as the law of the circuit abolishing per se treatment entirely in tying cases.

As for *P & E I* and *P & E II*, in neither of the *P & E* appeals did our Court of Appeals issue a substantive ruling on the tied market power issue that motivated Judge Holderman's grant of j.n.o.v. Instead each of those appeals was disposed of on purely procedural grounds.

*P & E I* was a waiver case, not an antitrust case (826 F.2d at 719):

> In any event, whatever the law [of tying] may be or ought to become, in this case the question is moot since the issue of threatened market power in the tied market was waived at trial by Sterling.

Nonetheless, to the extent that Judge Cudahy's opinion touched on substantive issues of antitrust law, it confirmed the analysis already voiced in this opinion. That much is clear not only from the already-quoted citation to *P & E I* that concluded this opinion's discussion of *Will* but also from this further statement by Judge Cudahy (*id.* at 718):

> We note, however, that both *Will* and [*Sandburg*], on which *Will* relies, are controlled by [*Jefferson Parish*] .... [T]he Stevens opinion does not seem to suggest any role for the threat of market power in the tied product market as a factor in the analysis.

On remand following *P & E I*, Judge Holderman refused Sterling's request for a new trial. And then on appeal in *P & E II* the Court of Appeals again faced no substantive questions of antitrust law. Judge Bauer's opinion discusses antitrust law only to the limited extent needed to illuminate the panel's rulings on the law governing the grant of a new trial.

To the extent that Judge Bauer did touch in passing on substantive issues of antitrust law, it is clear that this final panel—like the earlier *P & E I* panel—had no quarrel with the *Jefferson Parish* majority. No other interpretation lends itself to Judge Bauer's dictum that "this is a threadbare antitrust claim under both the law of tying cases as it is and, certainly, under tying law as certain people argue it should be" (866 F.2d at 234). That reference to "certain people" unmistakably speaks of Justice O'Connor's concurrence and its adherents, and it just as unmistakably treats Justice Stevens' majority view as the law of this Circuit.

\* \* \*

At first glance it might seem that our Court of Appeals' tying cases are not easily harmonized. By citing Justice O'Connor's *Jefferson Parish* concurrence, the *Sandburg* and *Will* panels doubtless intended to signal their general agreement with its approach—something that hardly makes those cases outliers in either the scholarly or the judicial communities.[10] But those cases surely did not make Justice O'Connor's concurring view the law of this Circuit.

Perhaps that generalized signal by the *Sandburg* and *Will* panels has made it somewhat more difficult to discern the exact contours of tying law in this circuit.[11]

---

**10.** Even the majority opinion in *Jefferson Parish*, though essentially a restatement of traditional tying law, "appear[s] to have retreated from [the] stern position" that "tying arrangements exist[ ] only to inhibit competition" (*Foremost Sales Promotions, Inc. v. Director, Bureau of Alcohol, Tobacco and Firearms*, 860 F.2d 229, 237 & n. 11 (7th Cir.1988)).

**11.** Two District Courts in the Seventh Circuit have shared Sterling's difficulty in that respect. Judge Michael Mihm's opinion in *State of Illinois ex rel. Hartigan v. Panhandle Eastern Pipe Line Co.*, 730 F.Supp. 826, 931 (C.D.Ill.1990),

*aff'd on other grounds*, 935 F.2d 1469 (7th Cir. 1991), accepted the *Sandburg* and *Will* statements about tied market power as circuit law, although acknowledging them as dictum because the panel in *P & E I* had rejected those statements in dictum. With all respect to Judge Mihm, this Court adheres to the just-completed analysis as demonstrating that *Sandburg* and *Will* did *not* establish tied market power as an element of a per se tying case. Two years earlier this Court's colleague Honorable Charles Norgle, in *Return on Investment Systems v. Translogic Corp.*, 702 F.Supp. 677, 680–81

Yet any appearance of tension with Supreme Court authority on this issue—whether real or fancied—does not represent the sort of wilful disobedience chastised by Justice Stevens, and somewhat less forcefully by the majority opinion, in *Rodriguez de Quijas.* Instead it is part of the healthy give-and-take between the circuits and the Supreme Court that is so much a part of our legal system and contributes to the way in which the law evolves.

 In the end one thing is clear enough. Careful reading of the Seventh Circuit cases demonstrates that tied market power was not and is not an essential element of a per se tying case in the Seventh Circuit. And in turn that means that there is no basis for believing that a timely motion for directed verdict or j.n.o.v. in the *P & E* litigation would ultimately have saved Sterling from defeat. After all, the *P & E* jury expressly found every element of a traditional per se tying claim (omitting only the nonexistent element of market power in the tied product) in favor of P & E and against Sterling. As a matter of Illinois tort law, then, Law Firm's failure to preserve the issue of tied market power could not have been the proximate cause of Sterling's defeat.

### Conclusion

Further discovery and trial preparation on the issue of breach of duty would serve no useful purpose.[12] Though Sterling brought its present motion under Rule 16 to simplify the case from its own perspective, it has succeeded in shooting itself in the foot (or, to frame a more accurate

(N.D.Ill.1988), cited *Sandburg* and *Will* on tied market power with approval. It appears from his brief opinion that the parties there did not contest the issue of whether tied market power was an element of the claim; their dispute rather centered on whether the plaintiff's complaint made allegations adequate to prove that assumed element. It is therefore not surprising, nor is it persuasive to this Court, that Judge Norgle did not go out of his way to disprove the existence of the element as circuit law.

metaphor under the circumstances, in the temple). Its motion has ended the case. This Court hereby orders the action dismissed.

12. That statement ought to be hedged a bit. Because this opinion deals with what is not a true summary judgment motion, limited as it is to a single potentially dispositive issue (see n. 3 and the Appendix to this Court's opinion in *Teamsters Local 282 Pension Trust Fund v. Angelos,* 649 F.Supp. 1242, 1252–53 (N.D.Ill.1986)), if our Court of Appeals were to disagree with the conclusion reached here this case would need the full-blown added discovery and legal development essential to a trial (or perhaps to a true summary judgment motion) on the remaining issues.